BaRney, J.,
delivered the opinion of the court:
■ By act of Congress of March 3, 1901 (31 Stat., 1078), this court was empowered to hear, ascertain, and report to Congress what members of the Sisseton and Wahpeton bands of Dakota or Sioux Indians remained loyal to the Government of the United States and were not concerned in the depredations of certain bands of Sioux Indians named in the act of Congress February 16, 1863, infra, and to hear, ascertain, and report to Congress what annuities provided by the treaty with said bands of July 23,1851, infra, would now be due if the said act of Congress had not been passed. Under the authority of that act a petition was filed in this court, and upon trial it was decided that upon the evidence produced it was impossible to determine who the individual members *422 were who remained loyal and did not participate in the depredations mentioned. (39 C. .Cls. B.., 112.)
By a provision contained in an act of Congress approved June 21, 1906, other and further jurisdiction upon the same matter was conferred upon this court, which provision is quoted in full in the findings; but the only part of the same, the effect of which is necessary for discussion in this opinion, is as follows:
“ That jurisdiction be, and hereby is, conferred upon the Court of Claims in Congressional case numbered twenty-two thousand five hundred and twenty-four, on file in said court, entitled ‘ The Sisseton and Wahpeton bands of Sioux Indians against the United States,’ to further receive testimony, hear, determine, and render final judgment in said cause, for balance, if any is found due said bands, with right of appeal as in other cases, for any annuities which would be due to said bands 'of Indians under the treaty of July twenty-third, eighteen hundred and fifty-one (Tenth Statutes at Large, page nine hundred and forty-nine), as if the act of forfeiture of the annuities of said bands, approved February sixteenth, eighteen hundred and sixty-three, had not been passed; and to ascertain and set off against the amount found to be due to said Indians, if any, all payments or other provisions of every name or nature made to or for said bands by the United States, or to or for any members thereof, since said act of forfeiture was passed, which are properly chargeable against said unpaid annuities.”
In order to better understand the subject of account between the claimant and the Government, we believe it to be necessaiy to give a brief history of the treat}'- and other relations between the parties during the time this account has been pending. And in so doing we shall only refer to such matters as are in dispute, and shall make no reference to other matters and appropriations about which there is no contention, excepting as the same may incidentally affect the matters under discussion.
In the year 1851 there were four bands of the Sioux Indians in Minnesota, divided into two groups: One generally known as the Lower Sioux, and consisting of the Medwakan-ton and Wahpakoota bands, and the other generally known as the Upper Sioux, consisting of the Sisseton and Wahpeton bands, who are the claimants in this case. In that year the *423 United States entered into a treaty with the claimant Indians, by the terms of which they bound themselves to pay these Indians the sum of $305,000 and a yearly annuity of $13,600 for fifty years (10 Stat., 949). Thereafter annual appropriations were made by Congress for the payment of these installments, until the passage of the forfeiture act of 1863, hereinafter mentioned. In the year 1862 an outbreak of the Sioux Indians occurred, in which they committed terrible depredations and outrages upon the settlers in Minnesota, constituting one of the darkest pages in the history of Indian warfare. It is undisputed that at least a part of the claimant Indians were engaged in this outbreak and massacre, together with the Lower Sioux above mentioned. The Lower Sioux were, however, located nearer the white settlement, and for this reason probably a larger proportion of them participated in the outrages.
Because of these outrages committed by the Sioux Indians, Congress, on the 16th of February, 1863, passed an act by which the annuities provided for by the treaty of 1851 were forfeited to the Government;, and in the same act a portion of these annuities then remaining in the Treasury unpaid, together with some annuities to become due under said treaty, was appropriated for the relief of the white settlers who had suffered from these depredations. (12 Stat. L., 652.)
Afterwards Congress recognizing the fact that all of these bands were not engaged in this outbreak, but on the contrary that some of them had assisted in suppressing it, from time to time, appropriated moneys to members of the claimant bands, as well as members of the Loiver Sioux, in" payment for such assistance. The sums so paid to members of both the Lower Sioux and Upper Sioux amounted in the aggregate to $206,353.30. (26 Stat., 1038;. 21 Stat., 624; 28 Stat., "889.) In these general appropriation acts it was mentioned that these payments were made as part of the annuities provided for in the treaty of 1851 notwithstanding the forfeiture.
In 1858 the claimant Indians concluded another treaty with the United States, containing the following provision:
“ The Sisseton and Wahpeton bands of Dakota or Sioux Indians acknowledge their dependence on the Government of *424 the United States, and do hereby pledge and bind themselves to' preserve friendly relations with the citizens thereof, and to commit no injuries or depredations on their persons or property * * * ; but in case of any such injury or depredation, full compensation shall, as far as practicable, be made therefor out of their moneys in the hands of the United States, the amount in all cases to be determined by the Secretary of the Interior(12 Stat. L., 1039.)
After the suppression of the outbreak of 1862, the United States removed from their then reservations at least some of the Sioux Indians who were engaged in it, although there appears to be some dispute as to whether all of the claimant Indians were so removed; but from the view we take of the case, as hereinafter more fully stated, that question is immaterial and is not here discussed.
The cost of such removal, together with the damages which were paid by the Government to the white sufferers in addition to the sum before mentioned, and sums appropriated from time to time for the support of the claimant Indians, including the Lower Sioux, amounted to $1,778-,-709.48. If we deduct from this amount the cost of removal, $163,060.06, the sum paid would be $1,615,649.42. (Senate Doc. No. 68, Fifty-fifth Congress, second session, 20.)
April 22, 1867, another treaty was concluded between the claimant Indians 'and the United States (15 Stat., 505-511), by which -the Indians ceded to the United States “ the right to construct wagon roads, railroads, mail stations, telegraph lines, and such other public improvements as the interests of the Government may require, over and across the lands claimed by said bands (including their reservation as hereinafter designated) over any route or routes that may be selected by authority of the Government, said lands claimed being bounded,” etc. (Treaty, Article II.) Article III of the same treaty continues: “For and in consideration of the cession above mentioned, and in consideration of the faithful and important services said to have been rendered by the friendly bands of Sisseton and Wahpeton Sioux here represented, and also in consideration of the confiscation of all their annuities, reservations, and improvements, it is agreed,” etc.; and in that and the two following articles setting apart *425 to tbe Indians certain reservations therein described. Article VI of said treaty is as follows:
“ And further, in consideration of the destitution of said bands of Sisseton and Wahpeton Sioux, parties hereto, resulting from the confiscation of their annuities and improvements, it is agreed that Congress will, in its own discretion, from time to time make such appropriations as may be deemed requisite to enable said Indians to return to an agricultural life under the system in operation on the Sioux Reservation in 1862, including, if thought advisable, the establishment and support of local and manual-labor schools; the employment of agricultural, mechanical, and other teachers; the opening and improvement of individual farms, and generally such objects as Congress in its wisdom shall deem necessary to promote the agricultural improvement and civilization of said bands.”
Under this treaty it is undisputed that Congress appropriated for and paid the claimant bands various sums, from time to time, in the aggregate amounting to $464,953.40. The treaty of 1858 provided that if the Senate should authorize the sale of certain lands belonging to the claimants, their debts should be paid out of a part of the proceeds of such sale; and such authorization being made and the lands sold, Congress appropriated the sum of $25,472.80 for said purpose.
Subsequently another treaty was concluded between the same parties, by which the claimants ceded to the United States the lands described in Article II of the treaty of 1867 (supra), and over which the United States then had the easement before mentioned, for the sum of $800,000, which was paid to them. (17 Stat., 281; 18 Stat. L., 167.)
It will be remembered that by the treaty of 1851 the claimant bands were to receive an annuity of $73,600 for fifty years, which, if it had been fully paid, would have amounted in the aggregate to $3,680,000 on July 1, 1902, when the last payment would have become due. In addition to this the Government agreed to pay the sum of $305,000. By the reinstatement of the provisions of that treaty there is placed to the credit of the claimants under the same the sum of $3,985,000, and as to this credit there is and can be no dispute.
The only contention in this case is as to the several sums which, in making up the account, are properly chargeable to *426 the claimants under the act conferring jurisdiction upon this court for that purpose.
•Before discussing the specific items which are so charged in the account we will briefly discuss the interpretation which we have given to the statutes bearing upon that subject.
The jurisdictional act (June 21, 1906), in its direction as to the several sums to be charged to the claimants, says: “And to ascertain and set off against the amount found to be due to the Indians, if any, all payments or other provisions, of every name or nature, made to or for said bands by the United States or to or for any members thereof, since said act of forfeiture was passed, which are properly chargeable against said unpaid annuities.”
It is insisted by the claimants that under this provision “ no moneys are properly chargeable against these unpaid annuities except such as have been paid in accordance with the provisions of that treaty (treaty of 1851), or which have, by act of Congress, been specifically charged against the same, by restoring the annuities to that extent; ” while it seems to be insisted by the counsel for the defendants that the account between them and the claimants, so made up and submitted by the Secretary of the Interior, is final and binding upon this court.
It does not seem to us that either of these constructions of the jurisdictional act should prevail. If the claimants’ contention is right there was no- reason or necessity whatever for the transmission of the case to this court. It was a mere problem of addition and subtraction, which any schoolboy could solve in a very few minutes. About the credit there never was and never could be any dispute; and the several sums which had been paid directly under the treaty of 1851, and subsequently in terms charged against the claimants under the same, could have been easily ascertained, added up, and subtracted from the credit, and the task would have been done. On the other hand, if the account as made up by the Secretary is to control, that could easily have been obtained without any reference to this court.
This leads us to an examination of the provision of the jurisdictional act above quoted, which directs us as to the *427 basis upon wbich this account shall be made. It is contended by the defendants that the words “ which are properly chargeable against said unpaid annuities ” is á limitation only upon such payments as have been made to individual members of the' claimants, and not to any payment which may have been made to the whole tribe; while it is insisted by the claimants that these words are a limitation upon all payment made, either to individual members or the tribe collectively.
It must be admitted that accepting either construction and taking the whole provision together there is some confusion and perhaps inconsistency in it. First, we are told to set off “ all payments or other provisions of every name and nature' made to or for said bands,” and afterwards only such “ as are properly chargeable against said unpaid annuities.” From the view, however, which we take of the whole provision, we think it makes but little or no difference as to which of the above constructions is given to it.
It is an elementary principle in.the construction of statutes that force and effect should be given to all -of the language used, if that can be done with reasonable consistency. Taking the provision as a whole we have no doubt it was^the intention of Congress that this court should do something more than look up the several appropriation acts and ascertain the sum total of the appropriations which have been made to the claimants in terms, in payment of the annuities provided by the treaty of 1851; that we should go further and examine “ all payments or other provisions of every name and nature ” made to them, and from the nature of the same and the circumstances under which they were made, determine whether they are “ properly chargeable against said unpaid annuities.” And we believe this’ intention is a fair and reasonable inference from the language of the act.
Otherwise, why the passage of the act at all, and why the industrious use of such language as “ all payments or other provisions of every name and nature ” and “ properly chargeable? ”
In the light of this construction of the jurisdictional act, we have made up the account as stated in the findings and *428 will briefly give our reasons for the several charges against the claimants.
ITEM 1. $760,586.22.
This item is made up by the appropriation for the first 12 installments under the treaty of 1851, less $122,404.46, the amount on hand and unpaid at the time of the passage of the forfeiture act of 1863, and also less $104.66 returned to the Treasury. This charge against the claimant is undisputed.
ITEM 2. $305,000.
This item is the sum which was provided for in the treaty of 1851, to be paid for various purposes, and is also undisputed.
ITEMS 3 AND 4. $122,509.12 AND $50,000.
These two items will be considered together, as they both depend upon the same state of facts, as well as the same principles of construction. The forfeiture act of 1863 (12 Stat. L., 052), appropriated two-thirds of the above sum of $122,-404.46, and also $100,000 of the annuities thereafter to become due under the treaty of 1851, $50,000 of which would be the share of advance annuities of the claimants. Of this amount, $120,220.24 was placed in the hands of the commissioners provided for in that act and charged with the distribution of the same among the white sufferers of the outbreak of 1862, and was expended for that purpose. The balance appears to have been disbursed in the payment for supplies for the claimants and for agents and school-teachers for them both before and subsequent to the outbreak. (Senate Doc. 68, supra, pp. 4, 5.)
It would not take a very elastic construction of the jurisdictional act in this case to charge the claimants with the sum so expended if there was no other treaty to be considered than that of 1851, for the damages were caused by their own devilish acts and that of their brethren, and there would seem to be no good reason why they should not pay for them. But when we examine the treaty of 1858 (12 Stat. L., 1039) all doubt appears to be removed. By the terms of the latter treaty, supra, the claimant Indians expressly agreed to pay these damages “ out of their moneys in the hands of the *429 United States.” We have no hesitancy in charging these two items to the claimants.
ITEM 5. $103,176.65.
It is undisputed that Congress from time to time appropriated double the above amount, $206,358.30, for the payment of the “ scouts and soldiers of the Sisseton, Wahpeton, Med-wakanton, and Wahpakoota bands of Sioux who were enrolled and entered into the military service of the United States,” etc., and that that amount is specifically made chargeable against the annuities of the four bands mentioned.
The several appropriation acts show that this gross sum of $206,353.30 was appropriated for the scouts of the four bands of Sioux mentioned collectively, and as there is no reliable evidence before this court showing with any degree of certainty how much of this amount went to each band, we think t'he just way of settling the matter is to charge one-half of this amount to the Lower Sioux and one-half to the claimants.
ITEM 6. $807,824.71.
This is one-half of the amount of the several sums which have been appropriated by Congress at different times for the payment of damages to the settlers growing out of the outbreak of 1862, and other sums appropriated for the support of the four bands of Indians before mentioned. Some of these appropriations are in terms made chargeable to the annuities of the claimants (see 23 Stat. L., 344), while in other instances no mention of annuities is made. It-is undisputed that double the above amount was appropriated and paid either (1) for damages to settlers growing out of the outbreak of 1862, or (2) for support of these four bands of Indians since the forfeiture act of 1863. This being the case, we think that the several sums in this item for damages should be charged to the claimants in making up this account, under the treaty of 1858, supra, and that the sums appropriated for support are “properly chargeable” against "them as being in fact, if not in terms, in lieu of their annuities under the treaty of 1851.
In connection with the above sum the Secretary of the Interior has charged the claimants with $81,530.03, that sum *430 being one-half of the amount claimed to have been expended for the removal of the Lower and Upper Sioux to new homes after 1862, and the defendants insist that that is a proper charge in this account. It is contended by the claimants, as before stated, that they never were so removed, and that if chargeable to any Indians it should be charged to the Lower Sioux. According to our construction of the law applicable to this case, we do not think this sum of $81,530.03 is chargeable to the claimants in making up this account in any event. It was not for damages, and so did not come under the treaty of 1858; it was not for support, and so did not become in any way a proper charge under our interpretation of the jurisdictional act, and hence was excluded from this account. In this connection we might add that it seems always to have been the policy of the United States to encourage the removal of the Indians westward, and to pajr the expenses of such removal. (Cherokee Indians v. The United States, 40 C. Cls. R., 252, 341.)
ITEM 7. $464,053.40.
This item is made up of the several sums which have been paid to the claimants under the treaty of 1867' (15 Stat. L., 506). By this treaty, as already stated, the claimants ceded to the United States a right of way for railroads, telegraph lines, etc., over their lands, in consideration of which the United States confirmed to them certain reservations; and Article VI of said treaty is as follows:
“And further, in consideration of the destitution of said bands of Sisseton and Wahpeton Sioux, parties hereto, resulting from the confiscation of their annuities and improvements, it is agreed that Congress will, in its own discretion, from time to time make such appropriations as may be deemed requisite to enable said Indians to return to an agricultural life under the system in operation on the Sioux Beservation in 1862, including, if thought advisable, the establishment and support of local and manual-labor schools; the employment of agricultural, mechanical, and other teachers ; the opening and improvement of individual farms, and generally such objects as Congress in its wisdom shall deem necessary to promote the agricultural improvement and civilization of said bands.”
*431 It should be remarked; that Article VI above was added by the Senate as an amendment to the treaty as completed bi^ the Commissioner, and that the original treaty made no reference to the matters therein mentioned as to the consideration, etc.
The above amendment is a clear indication'to our minds that the Senate thereby intended that the sums so agreed to be paid should be in lieu of the annuities “ confiscated ” by the treaty of 1851. This opinion is strengthened by the fact that by a subsequent treaty, June 7, 1872, the United States paid the claimants $800,000 for a cession of the lands over which the right of way was given. (17 Stat. L., 281.)
For the reasons given, we have considered this item of $464,953.40 a proper charge against the claimants within the jurisdictional act.
ITEM 8. $581,978.37.
This item is made up of appropriations made by Congress for the claimant under Article III of the treaty of 1889 (26 Stat., 1037), and is in terms in lieu of the annuities provided for by the treaty of 1851. This item is admitted by the claimants to be a correct charge against them in this account, and hence needs no discussion.
The defendants have contended that we should further charge the claimants with an item of $25,472.30, which was paid pursuant to the treaty of 1858, supra. Article II of said treaty provided for the submission to the Senate of the question of the title of the claimants to certain lands, but in case it decided that they had such title it might authorize the sale of the same for their benefit. Article III of the same treaty provided that if the Senate should so authorize the sale of said lands, or should prescribe an amount to be paid to the claimants for their interest in said treaty, provision should be made by which their chiefs might authorize to be paid, “ out of the proceeds of said tract,” such sums as might be found necessary to pay their just debts, not exceeding $70,000, and it appears that said sum of $25,472.30 was paid to the claimants as the proceeds of said lands. This appears to us to be a transaction entirely independent of the account *432 under consideration, and in no way connected with the annuities provided for by the treaty of 1851, and hence not a proper charge against the claimants in this case.
We have thus considered all of the several items which are in dispute in this case, and have reached the conclusion that the claimants are entitled to a judgment of $788,971.53, and it is so ordered.