**Sheldon Peters WOLFCHILD,
et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 03–2684L.

United States Court of Federal Claims.

Oct. 27, 2004.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for plaintiffs. With him on the briefs were William F. Mohrman and Eric L. Lipman.

Benjamin Longstreth, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice. With him on the briefs was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division.

James M. Schoessler, Jacobsen, Buffalo, Schoessler & Magnuson, Ltd., St. Paul, MN, for amicus curiae Lower Sioux Indian Community in Minnesota.

Greg S. Paulson, Blue Dog, Olson & Small, P.L.L.P., Minneapolis, MN, for amicus curiae Shakopee Mdewakanton Sioux (Dakota) Community. With him on the briefs was Andrew M. Small.

Joe Halloran, Jacobsen, Buffalo, Schoessler & Magnuson, Ltd., St. Paul, MN for amicus curiae Prairie Island Indian Community in Minnesota.

Raymond Cermak, Sr., Vadnais Heights, MN, pro se, as amicus curiae.

### OPINION AND ORDER

LETTOW, Judge.

This dispute concerns the United States' management of property originally provided for the benefit of those Mdewakanton Sioux who were loyal to the United States during the Sioux Outbreak in Minnesota during 1862. The property at issue consists of land, improvements to land, and monies derived from special funds provided by the United States in appropriations statutes enacted in 1888, 1889, and 1890. For approximately ninety years, the property acquired by and generated from the specially appropriated funds was maintained by the United States for the use and benefit of the loyal Mdewakanton and their lineal descendants. However, in 1980, a statute was enacted that was used by the Department of Interior as a basis for disbursing the property to three Indian communities that are not exclusively comprised of lineal descendants of the loyal Mdewakanton. Non-descendants allegedly comprise a majority of the members of two of the communities. The plaintiffs aver they are lineal descendants of the loyal Mdewakanton, and they bring before the court claims of breach of fiduciary duty and contract by the United States. The government has filed a motion to dismiss, arguing that this court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief may be granted. Plaintiffs have filed a cross-motion for partial summary judgment that a trust exists for the benefit of the lineal descendants, that the government has breached its fiduciary duties, and that a contract exists and has been breached.

Over 250 individuals are currently named plaintiffs in this action. The plaintiffs have filed a motion for leave to amend their complaint to include yet additional named and anonymous plaintiffs, claiming with respect to the anonymous plaintiffs that a substantial

number of them are members of the communities that now hold the property, that the remainder of them are applicants for membership, and that their membership status in those communities would be put in jeopardy if disclosure were to be made that they were plaintiffs in this action.

Motions for leave to participate as *amicus curiae* have been filed on behalf of each of the three Indian communities that have succeeded to property at issue in this case, *viz.*, the Lower Sioux Indian Community in Minnesota, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community in Minnesota. The movant communities seek to inform the court of the basis for their interest in the property and their interest in preserving their alleged authority as sovereigns over the property. Plaintiffs oppose these motions. In addition,

one individual, Raymond Cermak, Sr., has moved for leave to participate as an *amicus curiae*, averring that he is a lineal descendant of the loyal Mdewakanton and that he previously received direct payments of trust monies from the government as a lineal descendant. Plaintiffs also oppose Mr. Cermak's motion.

For the reasons stated below, the government's motion to dismiss is granted in part and denied in part. The plaintiffs' cross-motion for partial summary judgment is also granted in part and denied in part. The plaintiffs' motion for leave to amend their complaint is granted, as is the motion for leave for some plaintiffs to participate anonymously. The motions by each of the communities to participate as *amicus curiae* are granted as is the motion by Raymond Cermak, Sr.

## TABLE OF CONTENTS

BACKGROUND ............................................................... 526
 The 1862 Sioux Outbreak ............................................. 526
 The 1886 Census and the 1888, 1889, and 1890 Appropriations Acts ......... 526
 Trust Creation and Land Assignments ................................. 528
 Evolution of the Three Communities .................................. 529
 The 1980 Act ...................................................... 530
 This Lawsuit ...................................................... 533

ANALYSIS .................................................................. 535
 Standards for Decision ............................................. 535
 *Amici Curiae* .................................................... 536
 Standing .......................................................... 537
 Jurisdiction ...................................................... 539
 A. Statutory Predicates for Suit .................................. 539
 B. Nature of Plaintiffs' Claims ................................... 540
 1. *Breach of fiduciary duty* .............................. 540
 (a) *Existence of a trust.* ........................... 540
 (b) *The 1980 Act.* .................................. 543
 (c) *Money-mandating duty.* ........................... 544
 2. *Breach of Contract* .................................. 546
 C. Statute of Limitations ......................................... 547
 D. The *Menominee Tribe* Exception ................................ 549
 Partial Summary Judgment ........................................... 551
 Amendment of the Complaint ......................................... 551
 A. Additional Plaintiffs .......................................... 552
 B. Anonymous Plaintiffs ........................................... 552
 Future Proceedings Respecting Class Certification ..................... 554
 Potential Summons under RCFC 14(a) .................................. 555

CONCLUSION ............................................................... 555

## BACKGROUND [1]

### The 1862 Sioux Outbreak

Prior to 1862, the Minnesota Sioux consisted of four bands known as the Mdewakanton and the Wahpakoota (together comprising the "lower bands"), and the Sisseton and the Wahpeton (known as the "upper bands" or the "Santee Sioux"), all of whom lived along the Minnesota River. *See Medawakanton and Wahpakoota Bands of Sioux Indians v. United States*, 57 Ct.Cl. 357, 359–61, 1922 WL 1863 (1922).[2] In August of 1862, young traditionalists in these four bands waged war against the United States, killing more than 500 white settlers and damaging substantial property. *See id.* at 362; *see also* Pls.' Ex. 36, at 187 (William Watts Folwell, *A History of Minnesota* (vol.II, 1924)). After defeating the bands, the United States punished the Sioux by nullifying its treaties with them, among other things voiding annuities that had been granted as part of the terms of the treaties. *See* Act of Feb. 16, 1863, 12 Stat. 652.[3] The government also moved the Sioux to tracts of unoccupied land outside the limits of the then-existing states, including Minnesota and Iowa, which originally resulted in their moving to Dakota Territory. *Medawakanton*, 57 Ct.Cl. at 364–65. In February 1866, they relocated to a new reservation in Nebraska. *Id.*

Some of the Sioux, however, had been loyal to the United States during the Sioux Outbreak, and these loyalists were permitted to stay on the Minnesota lands provided for the Sioux under the treaties. After Congress stripped the Sioux of their Minnesota lands, it authorized the Department of Interior to allocate up to eighty acres of that land to each loyalist:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing whites from the late massacre [by] said Indians. The land so set apart ... shall be an inheritance to said Indians and their heirs forever.

Act of Feb. 16, 1863, 12 Stat. at 654. Recognizing further that many of the loyal Sioux had lost their homes and property because of their aid to whites, and that "now they cannot return to their tribe ... or they would be slaughtered for the part they took in the outbreak," Cong. Globe, 38th Cong., 1st Sess. 3516 (1864), Congress appropriated $7500 for the loyal Sioux in 1865. Act of Feb. 9, 1865, 13 Stat. 427.

### The 1886 Census and the 1888, 1889, and 1890 Appropriations Acts

The allocation of land to the loyal Sioux was not successfully implemented, and Con-

---

1. The facts set forth do not constitute findings of fact by the court. They are drawn from the Plaintiffs' Complaint ("Compl.") and First Amended Complaint ("Am.Compl."), the recitations of the parties in their oral arguments, motions, responses, replies, and other briefs, and from the materials provided to the court by *amici curiae*. The factual recitation has been presented to provide a basis for analysis of the issues raised in this case.

2. The Minnesota Sioux were also known as the Sioux of the Mississippi. By contrast, the Teton, Yankton, and Yanktonais Sioux were known as the Sioux of the Missouri.

3. An annuity had been granted in perpetuity pursuant to a treaty made by the United States with certain chiefs and bands of the Sioux, perhaps only the Mdewakanton Band, on September 29, 1837. *See* 7 Stat. 538. A separate treaty was made between the United States and the Mdewakanton and Wahpakoota Bands of the Minnesota Sioux on August 5, 1851, 10 Stat. 954, which, among other things, provided for a supplemental annuity payable for a fifty-year term. *See Medawakanton*, 57 Ct.Cl. at 360–61. The Sisseton and Wahpeton Bands signed a comparable treaty on July 23, 1851. *Id.*

After the treaties were nullified, the annuities ceased. *Id.* Eventually, however, the tribal bands recovered the present value of the annuities: the Sisseton and Wahpeton Bands by a 1906 Act of Congress enabling them to sue in the Court of Claims and by a judgment in *Sisseton and Wahpeton Bands v. United States*, 42 Ct.Cl. 416, 432[, 1907 WL 895] (1907), and the Mdewakanton and Wahpakoota through a special act of Congress approved March 4, 1917 and a consequent case in the Court of Claims. *See* 39 Stat. 1195 ("An act for the restoration of annuities to the Medawankanton and Wahpakoota (Santee) Sioux Indians, declared forfeited by the Act of February 16, 1863"); *Medawakanton*, 57 Ct.Cl. at 358.

gress further provided for the loyal Mdewakanton in 1888, when it authorized the Department of Interior to expend funds for them. Congress recognized that when it declared the Sioux's treaties, annuities, and allocation of land forfeited, it failed to make an exception for the loyal Mdewakanton, whose annuity was valued at approximately $1,000,000. 19 Cong. Rec. H2976–77 (daily ed. Apr. 14, 1888) (statement of Rep. MacDonald). As a result of this oversight, many loyal Mdewakanton were rendered homeless. *Id.* at 2977. The 1888 Act provided an appropriated amount of $20,000 to be spent by the Secretary of Interior in purchasing land, cattle, horses, and agricultural implements for those full-blooded Mdewakanton who resided in Minnesota on May 20, 1886 and who had severed their tribal relations.[4] Because of the administrative difficulty of determining which Mdewakanton were loyal during the Sioux Outbreak, Congress determined that presence in Minnesota on May 20, 1886

served as an adequate proxy for "friendliness." Pls.' Ex. 16 (Memorandum from Nat'l Tech. Servs. Found. to Bureau of Indian Affairs (October 1979)).

A similar appropriation act in 1889 added a further sum of $12,000 and included a provision calling for each loyal Mdewakanton to receive as close to an equal amount as practicable. Act of Mar. 2, 1889, 25 Stat. 980, 992–93.[5] In a third appropriation act in 1890, Congress added $8,000 and adopted the same substantive provisions as the 1889 Act, except that it expressly stated that the further appropriated amount was to support Indians of both "full and mixed blood." Act of Aug. 19, 1890, 26 Stat. 336, 349. Overall, the value of the appropriations amounted to $20,000 awarded in 1888, $12,000 in 1889, and $8,000 in 1890. The latter two acts called for funds to carry over if the Department of Interior did not spend them by the end of the fiscal year, ensuring that the loyal Mdewakanton

4. The statutory text pertaining to the loyal Mdewakanton provided as follows:

> For the support of the full-blood Indians in Minnesota, belonging to the Medawakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations, twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses, and lands: *Provided,* That of this amount the Secretary if he may deem it for the best interests of said Indians, may cause to be erected for the use of the said Indians at the most suitable location, a school house, at a cost not exceeding one thousand dollars: *And provided also,* That he may appoint a suitable person to make the above-mentioned expenditures under his direction, the expense of the same to be paid out of this appropriation.

Act of June 29, 1888, 25 Stat. 217, 228–29.

5. The pertinent portion of the 1889 appropriation act reads as follows:

> For the support of the full-blood Indians in Minnesota heretofore belonging to the Medawakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, twelve thousand dollars, to be expended by the Secretary of the

Interior as follows: Ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each of these Indians or family thereof; one thousand dollars, or so much thereof as may be necessary, to defray the expenses of expending the money in this paragraph appropriated; and one thousand dollars for the completion and furnishing of the schoolhouse for said Indians authorized by [the 1888 Act]: *Provided,* That if the amount in this paragraph appropriated ... shall not be expended within the fiscal year for which either sum was appropriated, neither shall be covered into the Treasury, but shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians: *And provided also,* That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall received [sic], as nearly as practicable, an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: *And provided further,* That as far as practicable lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality against his will.

would benefit from the appropriation.[6]

To ascertain which Mdewakanton lived in Minnesota on May 20, 1886, U.S. Special Agent Walter McLeod took a census listing all of the full-blood Mdewakanton, which was mailed to the Commissioner of Indian Affairs on September 2, 1886. *See* Pls.' Ex. 1 (Enrollment of the Medawankanton Band of Sioux Indians of Minnesota); Pls.' Ex. 15 (Letter from Special Agent Walter McLeod to Commissioner of Indian Affairs (Sept. 2, 1886)). Although the census was not prepared as of May 20, 1886, inclusion on the McLeod list has been deemed to create a rebuttable presumption that an individual met the requirements of the subsequent 1888, 1889, and 1890 Acts. *See, e.g.,* Pls.' Ex. 20, at 2 (Memorandum from the Acting Associate Solicitor to the Field Solicitor (Aug. 19, 1971)). On January 2, 1889, Robert B. Henton, Special Agent for the Bureau of Indian Affairs, took a second census of those Mdewakanton living in Minnesota since May 20, 1886. *Id.* This second census was done at the request of the Secretary of the Interior, who wanted "information as complete as possible." Pls.' Ex. 17, at 2 (Letter from Secretary of Interior to Commissioner of Indian Affairs (Oct. 12, 1888)). The McLeod and Henton listings (together, "the 1886 census") were used to determine who would receive the benefits of the amounts appropriated under the 1888, 1889, and 1890 Acts.

The funds provided by these Acts were used for the purchase of land, agricultural implements, livestock, and goods for the loyal Mdewakanton. The lands purchased were commonly called the "1886 lands" to reflect the effective date of the census that defined the beneficiaries. The lands were purchased in three separate areas of Minnesota, and by 1980 they consisted of (1) approximately 260 acres in Scott County (the "Shakopee" lands), (2) approximately 575 acres in Redwood County (the "Lower Sioux" lands), and (3) approximately 120 acres in Goodhue County (the "Prairie Island" lands). H.R.Rep. No. 96–1409, at 4 (1980).[7]

*Trust Creation and Land Assignments*

Rather than conveying the acquired land directly to the loyal Mdewakanton for whom the land had been purchased, the Department of Interior, fearing sale or destruction of the property, kept title in the United States' name but made arrangements for the lands to be made available to the loyal Mdewakanton. The mechanism chosen for that purpose was an assignment system by which a specific parcel of land would be assigned to a particular beneficiary who could use and occupy the land as long as he or she wanted, but if the assignee did not use it for two years, it would be reassigned. Because the legislation called upon the Secretary of Interior to expend the funds as he deemed best, and in the absence of legislation requiring transfer of title, the assignment policy persevered over the years. *See, e.g.,* Pls.' Ex. 18, at 6 (Letter from Assistant Comm'r of Indian Affairs to Sec'y of Interior (Sept. 30, 1915)).

Some of the land purchased for the Mdewakanton was not arable; one parcel was next to a brickyard where many Mdewakan-

*Id.*

6. Appropriations to the loyal Mdewakanton under the 1888, 1889, and 1890 Acts were subtracted from the damage award entered in favor of the Mdewakanton in 1922 by the Court of Claims in recompense for the nullified annuities. *Medawakanton,* 57 Ct.Cl. at 367.

7. Three prior acts had also allocated funds for the purchase of lands. *See* Act of July 4, 1884, 23 Stat. 1887; Act of Mar. 3, 1885, 23 Stat. 375; Act of May 15, 1886, 24 Stat. 39. The 1884 and 1885 Acts expressly required the beneficiaries to be "those of the Mdewakanton Band, who remained faithful to the whites during the outbreak of 1862–3 ... and for the descendants of those friendly Indians." Def.'s Ex. 4, at 275 n.4 (Roy W. Meyer, *History of the Santee Sioux* (1993))

("*History of the Santee*"). Walter McLeod was appointed on October 16, 1886 to purchase the lands, and he paid $4,103 for 339.70 acres of land. Pls.' Ex. 23, at 111 (1891 Comm'r of Indian Affairs Ann. Rep.). Much of this land was deeded to individual Indians in fee simple. *History of the Santee* at 279. Some of the beneficiaries sold the land, mortgaged it, or removed its resources. *Id.* at 283; Pls.' Ex. 3 (Letter from Ass't Comm'r of Indian Affairs to Sec'y of Interior (Sept. 30, 1915)). Robert Henton was appointed on October 20, 1888 to make additional purchases, and he spent $16,581.42 in acquiring 1, 100.99 acres of land. Pls.' Ex. 23, at 111 (1891 Comm'r of Indian Affairs Ann. Rep.). This land was retained by the United States on behalf of the Mdewakanton to avoid repeating the sale, mortgage, and depletion of prior lands. *History of the Santee* at 283.

ton worked, and its only usable resource was clay. At the request of the Mdewakanton, Congress considered a bill permitting the Secretary of Interior to sell this tract of land. In debating an amendment to require each Mdewakanton's consent to the sale, which ultimately passed, Senator Pettigrew argued that "[i]t is not an Indian reservation. These Indians own the homes, and they have a right there greater than that of reservation Indians. The land was purchased for their benefit, and the title is in them subject to a provision by which they can not convey it." 34 Cong. Rec. 2523 (1901). The bill providing for the land sale was enacted, and the Secretary was empowered to sell the land provided that "the written consent of the adult Indians residing in Redwood County, Minnesota, shall first be given." Act of Feb. 25, 1901, 31 Stat. 805, 806. The 1901 Act effectively constituted an explicit recognition by Congress that a trust had been created and funded by the appropriations made under the 1888, 1889, and 1890 Acts. By requiring the consent of the beneficiaries for partial termination of the trust, Congress implemented a basic precept of traditional trust law. *See Restatement (Third) of Trusts* § 65(1).

In carrying forward with its responsibilities respecting the 1886 lands, the Department of Interior provided documentary evidence of land assignments to assignees. Indian Land Certificates described the tracts of land, certified that the particular individual "and his heirs are entitled to immediate possession of said land, which is to be held in trust, by the Secretary of the Interior, for the exclusive use and benefit of the said Indian, so long as said allottee or his or her heirs occupy and use said land." Pls.' Ex. 35 (Indian Land Certificate of Harry Bluestone (June 1, 1905)). If the land were to be abandoned for a period of time, usually two years, then the land would be reassigned to another beneficiary; any sale, transfer, or encumbrance of the land other than to the United States was void. *Id.* Although not guaranteed by the assignment, in practice an assignee's land would pass directly to his children upon his death, but other relatives needed to follow procedures established by the Bureau of In-

dian Affairs to receive an assignment. *See* Pls.' Ex. 34 at 2, 22 (*Smith v. Bureau of Indian Affairs,* Indian Probate No. IP TC 389S–81 (1990)).

### Evolution of the Three Communities

In 1934, the Indian Reorganization Act changed the federal government's relationships with Indian tribes. Act of June 18, 1934, 48 Stat. 984 (also known as the Wheeler–Howard Act) (codified at 25 U.S.C. §§ 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479). Primarily, this Act was designed to permit Native Americans to form federally-recognized tribes and to transfer the functions of the Department of Interior and the Office of Indian Affairs regarding reservations to the tribes. *See Indian Reorganization Act: Hearings on H.R. 7902 Before the House Comm. on Indian Affairs,* 73d Cong. 1 (1934). Pursuant to the Act, the Mdewakanton and others formed three communities: the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community. *See, e.g.,* Shakopee and Prairie Island *Amici* Br. Ex. A. (Constitution & Bylaws of Prairie Island Indian Community). The communities were and are not exclusively comprised of descendants of loyal Mdewakanton, nor were nor are all descendants members of one of the communities. *See* Pls.' Ex. 30, at 2 (Letter for the Field Solicitor to the Minneapolis Area Dir. of the Bureau of Indian Affairs (Nov. 8, 1978)).

In theory, the Indian Reorganization Act should not have affected the rights of the lineal descendants of the loyal Mdewakanton because it established that "[t]he existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress." 25 U.S.C. § 462. However, a memorandum dated January 25, 1955 from the Minneapolis Area Office of the Bureau of Indian Affairs listed regulations for the issuance of such assignments that gave some effect to the Indian Reorganization Act. If an individual wanted to apply for an assignment of land, he or she first had to file an application with the Indian Community Council of the community with jurisdiction

over the land. Pls.' Ex. 25 (1955 Minneapolis Area Office Indian Affairs Manual, Supp. No. 11). Next, the community would forward the application to the Superintendent with recommendations about the action to be taken. The Superintendent would ensure that the applicant was an eligible beneficiary of the loyal Mdewakanton land. *Id.* Upon approval, the Superintendent would forward it to the Area Director for assignment. The solicitation of recommendations by the local communities was "a courtesy only and [was] by no means a legal necessity, since the communities have no decision making authority concerning use of these lands." Pls.' Ex. 30, at 2 (Letter for the Field Solicitor to the Minneapolis Area Dir. of the Bureau of Indian Affairs (Nov. 8, 1978)).

Over time, the communities acquired lands in addition to the 1886 lands. This additional land was interspersed among the 1886 lands, resulting in a "checkerboard pattern." H.R.Rep. No. 96–1409, at 6 (1980). The additional land was not subject to the assignment process that applied to the 1886 lands, which were available only to lineal descendants of the loyal Mdewakanton. S.Rep. No. 96–1047, at 2 (1980). If no eligible Mdewakanton took an assignment, the Secretary of Interior could lease the land for fair market value, with the proceeds from the lands deposited by the Department of Interior in accounts held for the benefit of the lineal descendants. *See* Pls.' Ex. 29, at 5–6 (Memorandum to Comm'r of Indian Affairs from Acting Assoc. Solicitor, Indian Affairs (March 19, 1974)); Hr'g Tr. 105–06.[8] Thus, the trust principal came to consist of land, appurtenances to land, and monies, all deposited for the benefit of the lineal descendants.

Membership in the communities also gave rise to significant issues. Over the years, the communities gained a great deal of discretion in determining who kept or attained membership. *See* Pls.' Ex. 29, at 3 n.2 (Memorandum to Commissioner of Indian Affairs from Acting Associate Solicitor, Indian Affairs (March 19, 1974)) ("The persons comprising the membership in those organizations[, *i.e.,*

the communities] are not all Mdewakanton."). Because the Department of Interior recognized the importance of the communities' right to self-government and the right to determine their own membership, a lineal descendant of a loyal Mdewakanton might be denied admission to, or removed from, membership in a community even if the descendant lived on 1886 land encompassed by the community boundary. Pls.' Ex. 33, at 2 (Letter from Bureau of Indian Affairs, Midwest Reg'l Office to Anonymous Mdewakanton (Aug. 20, 2001)).

Prior to the 1980 Act, the Department of Interior consistently treated the 1886 lands as being held in trust for the exclusive benefit of the loyal Mdewakanton and their descendants. The language in Land Certificates for the 1886 lands noted that such land "is to be held in trust, by the Secretary of the Interior, for the exclusive use and benefit of the said Indian." Pls.' Ex. 35 (Indian Land Certificate of Harry Bluestone) (June 1, 1905). This treatment continued in 1978, when a Field Solicitor stressed that "none of the three Community governments, organized under the Indian Reorganization Act and operating under constitutions and bylaws, has any right, title or interest in these lands. The land is held for the benefit of a specific class of people and their descendants." Pls.' Ex. 30, at 1–2 (Letter for the Field Solicitor to the Minneapolis Area Dir. of the Bureau of Indian Affairs (Nov. 8, 1978)).

### The 1980 Act

By 1980, the communities sought greater control over the use of the lands. The constitution and bylaws for each of the communities had established two classes of members: (1) "all members of the community who were entitled to the benefits of the tribal lands acquired under the Reorganization Act and [2] members who were descendants of the 1886 Mdewakanton and who had exclusive rights to the benefits of the 1886 lands." H.R.Rep. No. 96–1409, at 2 (1980). A legislative proposal was made to Congress to eliminate this distinction and to confer greater

---

8. The March 1974 Memorandum explicated in considerable detail the origins of the trust in the Appropriation Acts of 1888, 1889, and 1890, and the ensuing responsibilities of the Secretary of Interior as trustee.

control on the communities. The proposal was introduced in the House as H.R. 7147 by Rep. Richard Nolan of Minnesota on April 23, 1980 and was referred to the House Committee on Interior and Insular Affairs. *See* 126 Cong. Rec. 8864 (1980). The bill addressed the 1886 lands specifically and would have conveyed the United States' interest in those lands to the United States in trust for the three communities. *See* 126 Cong. Rec. 29785–86 (1980). The Department of Interior issued a favorable report to the House Committee on the bill, making only one suggestion about language. The Department requested that the bill include a generic description of the 1886 lands and that publication of a legal description of the lands involved be subsequently made in the *Federal Register*. That suggestion was made "to avoid the need to include in the bill a detailed land description that is both cumbersome and subject to inadvertent error." H.R.Rep. No. 96–1409, at 6 (Letter from Thomas W. Frederick, Assistant Sec'y of Interior, to Hon. Morris K. Udall (Sept. 9, 1980)). The Congressional Budget Office advised that the bill made a "technical change in the status" of the lands and "that no additional cost to the government would be incurred as a result of enactment of th[e] legislation." *Id.* at 3 (Letter from Alice M. Rivlin, Dir. of Cong. Budget Office, to Hon. Morris K. Udall (Sept. 11 1980)). Upon consideration by the House Committee on Interior and Insular Affairs, H.R. 7147 was amended to include a 40 acre tract that had been inadvertently omitted and a requirement that the Secretary of Interior publish a description of the lands in the *Federal Register*. H.R. 7147 then was reported favorably out of Committee by voice vote on September 26, 1980. H.R.Rep. No. 96–1409, at 2. In its report, the Committee found that the "distinction [in membership of the communities] has severely hampered the tribal efforts to achieve self-determination." *Id.* H.R. 7147, as amended by the Committee, was passed by the House on the consent calendar on November 17, 1980, without recorded or voice vote. *See* 126 Cong. Rec. 29, 785–86 (1980).

There was no comparable bill in the Senate. When the Senate received H.R. 7147 on Nov. 19, 1980, it was referred to the Senate Select Committee on Indian Affairs. S.Rep. No. 96–1047, at 2–3 (1980). This Committee reported the bill favorably by a unanimous poll of its members. *Id.* at 3. The Senate Report noted that the 1886 lands had been "acquired by the United States for the use and benefit" of the loyal Mdewakanton, but that under the proposed bill "all right, title, and interest in such lands would be declared instead to be held by the United States in trust for three Minnesota Sioux tribal Communities." *Id.* at 1. A stated reason for the bill was that the land assignments made to the descendants "are not encumberable documents that can be used in securing loans from commercial institutions." *Id.* at 6. H.R. 7147 was passed by the Senate on December 8, 1980, by unanimous consent. *See* 126 Cong. Rec. 32,898 (1980).

Thus, H.R. 7147 was passed by Congress during a lame-duck session held after the November 1980 elections. President Carter signed the bill into law on December 19, 1980, very near the close of his presidency. The full statutory text of the Act is as follows:

### An Act

To provide that certain land of the United States shall be held by the United States in trust for certain communities of the Mdewakanton Sioux in Minnesota.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all right, title, and interest of the United States in those lands (including any structures or other improvements of the United States on such lands) which were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians under the Act of June 29, 1888 (25 Stat. 217); the Act of March 2, 1889 (25 Stat. 980); and the Act of August 19, 1890 (26 Stat. 336), are hereby declared to hereafter be held by the United States–

(1) with respect to the some 258.25 acres of such lands located within Scott County, Minnesota, in trust for the Shakopee Mdewakanton Sioux Community of Minnesota;

(2) with respect to the some 572.5 acres of such lands located within Redwood County, Minnesota, in trust for the Lower Sioux Indian Community of Minnesota; and

(3) with respect to the some 120 acres of such lands located in Goodhue County, Minnesota, in trust for the Prairie Island Indian Community of Minnesota.

SEC. 2. The Secretary of the Interior shall cause a notice to be published in the Federal Register describing the lands transferred by section 1 of this Act. The lands so transferred are hereby declared to be a part of the reservations of the respective Indian communities for which they are held in trust by the United States.

SEC. 3. Nothing in this Act shall (1) alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act, or (2) restrict the authorities of the Secretary of the Interior under or with respect to any such contract, lease, or assignment.

Pub.L. No. 96–557, 94 Stat. 3262 (1980).

The 1980 Act, read literally, transferred whatever title the United States had in the 1886 lands from the United States to the United States in trust for the three communities. The 1980 Act failed to address what title the United States had in the 1886 lands. The Act also was silent as to the beneficial interest of the loyal Mdewakanton and their lineal descendants except that a savings clause preserved the rights of existing assignees. *Id.* § 3. In short, the 1980 Act addressed the trust relationship in existence regarding the 1886 lands only in a backhanded minor way through the limited savings clause. The 1980 Act also was silent as to the 1886 monies held by the Department of Interior for the benefit of the lineal descendants.

The extraordinarily poor drafting reflected in the 1980 Act did not slow its implementation by the Department of Interior. In a letter from the Acting Area Director of the Bureau of Indian Affairs dated January 15, 1981 to the Chairman, Community Council, Lower Sioux Community, the Department of Interior took the position that the 1886 lands and 1886 monies held by Interior would be treated as "tribally-owned" property, *i.e.,* it would now be controlled by the Community without reference to the 1886 restriction. Lower Sioux *Amicus* Br.App. 3. (Letter from David Granum to Leon Columbus (Jan. 15, 1981)). This interpretation was confirmed by a letter from the Field Solicitor to the Area Director dated February 6, 1981. Lower Sioux *Amicus* Br.App. 4 (Letter from Elmer T. Nitzschke to Edwin Demery (Feb. 6, 1981)). The Field Solicitor's letter addresses four topics of importance to the Department in implementing the 1980 Act: (1) the steps needed to transfer title to the 1886 lands, (2) the effect of the savings clause to the 1980 Act, (3) the disposition of 1886 monies, and (4) the desirability of preparing an inventory of the 1886 lands, monies, and other property being transferred.

As to title, the Field Solicitor indicated that transfer could not be effectuated until notice had been published in the *Federal Register:*

> Section 2 of this Public Law requires that a Notice be published in the Federal Register describing the lands transferred to the respective communities: Has such publication taken [p]lace[?] *[W]hile the transfer of title was effectuated by the passage of the Act, the incorporation of the lands in question within the bounds of the respective reservation may not legally be completed until such time as the required publication has been effectuated.*

*Id.* at 1 (emphasis added).[9]

Respecting the effect of the savings clause, the Field Solicitor advised that existing assignments had to be honored:

> [U]ntil such time as the interests described in the outstanding leases or assignments to the lands have expired or been terminated, the respective communities do not have a full proprietorial interest in those lands. When those lands are effectively incorporated within the jurisdiction or reservation of the respective communities by the afore-

---

9. A notice was published in the *Federal Register* on August 5, 1982. *See* 47 Fed.Reg. 34,050.

mentioned publication in the Federal Register, the communities will have full governmental or legislative jurisdiction over such land comparable to their jurisdiction over other lands of the reservation.

*Id.* at 2.

The Field Solicitor assumed that the 1980 law applied to the 1886 monies held by the Bureau of Indian Affairs for the benefit of the lineal descendants and that the 1886 monies could be turned over to the communities without notice to the 1886 beneficiaries:

One further matter for consideration is the accumulated revenues currently held by the Bureau identifiable to the lands in question. It is my understanding that the apportioned share belonging to or identified for the Shakoppee [*sic*] Community has already been turned over to that group. Similar action should be taken as to the other two communities claiming an interest in these monies. As to how the respective communities can utilize these funds, it is interesting to note, as pointed out in the Secretary's letter to OMB that the cost of acquiring the land in question was offset against the recovery by the Mdewakanton and Wahpakoot [*sic*] Bands of Souix [*sic*] Indians against the United States (57 Court of Claims 357 (1932)) [*sic*] the beneficiaries of which included many individuals other than those for whom such land was held by the United States. In light of this bit of information it may be that tribal use of these impounded funds may include other than those persons previously identified as eligible Mdewakantons for purposes of occupying the land in question.

*Id.*

Lastly, the Field Solicitor recommended that an inventory of the 1886 property be made in connection with transfer of the property to the communities:

It would be my suggestion that in preparation for meeting with the various communities on this legislation that the Bureau inventory all of the outstanding interests as to the lands transferred and be prepared to discuss them with each of the communities. Revenues from these lands produced after the effective transfer of title will be available to the tribe for tribal use as are the revenues from other acquired lands belonging to the Community.

*Id.* The materials made available to the court do not show that any such inventory was made.

To implement the 1980 Act, title to the 1886 lands, monies, and other property was transferred to the communities. Subsequent decisions by the Department of Interior have uniformly given effect to the ensuing transfer of title to the 1886 property, rejecting claims by lineal descendants of the loyal Mdewakanton. As Administrative Law Judge Amess stated in *Brewer v. Acting Deputy Assistant Sec'y for Indian Affairs*, 10 IBIA 110, at *16 (1982), prior to the Act, the United States held title for the benefit of the loyal Mdewakanton and their descendants, but "[w]ith passage of the Act of Dec. 19, 1980, title was held in trust for the community to be managed by it for the benefit of the community and its members." *See also Gitchel v. Minneapolis Area Dir.*, 28 IBIA 46, 48 (1995) ("there is simply no question as to the intent of Congress in 1980 to convey the beneficial title to these lands to the Community"); *cf. Cermak v. Norton*, 322 F.Supp.2d 1009, 1015 (D.Minn.2004) (holding that the Acting Area Director's decision not to reissue land certificates to heirs was not arbitrary and capricious).

Since 1980, the laws and regulations concerning Indian gambling have changed, making operation of gaming venues on community land feasible and lucrative. Operation of casinos, hotels, entertainment centers, and other developments, rather than agriculture, has generated very high income for one of the communities. Am. Compl. ¶ 33. Subsequently, the Shakopee Mdewakanton Sioux (Dakota) Community reportedly has purchased "thousands of acres of suburban land" in the Minneapolis–St. Paul metropolitan area. Hr'g Tr. at 90. The lineal descendants have been shut out from this largesse to the extent that they have not been members of the favored community.

*This Lawsuit*

The four originally named plaintiffs claimed to sue "on behalf of themselves and

all other descendants of persons listed on the May 20, 1886 U.S. Mdewakanton census." Am. Compl. ¶ 2. The Complaint alleges that the properties purchased with funds appropriated by the 1888, 1889, and 1890 Acts constituted the corpus of a trust, with legal title in the United States, but with equitable title in the loyal Mdewakanton and their lineal descendants. They aver that the United States breached its fiduciary duty in 1980 and thereafter by transferring trust assets and permitting non-descendants to receive profits from the casinos and other property on the lands in question. *Id.* ¶¶ 35–41. Secondarily, the plaintiffs allege that a contract was created between the loyal Mdewakanton and the United States through which the Mdewakanton renounced their tribal affiliation in exchange for the appropriated trust property and that the government breached this contract. *Id.* ¶¶ 50–55.

After plaintiffs filed their amended complaint, the government responded with a motion to dismiss, which makes three principal arguments. First, the government argues that the court has no jurisdiction to hear this case under the Tucker Act, 28 U.S.C. § 1491(a)(1), or Indian Tucker Act, 28 U.S.C. § 1505, because the government had no money-mandating fiduciary duty. As the government would have it, no trust existed prior to 1980, and, even if one did, the 1980 Act transferred equitable title in the 1886 lands to the communities from the lineal descendants. Def.'s Mot. to Dismiss at 12–13. The government also argues that the loyal Mdewakanton and their lineal descendants are not an "identifiable group of American Indians" under the Indian Tucker Act. *Id.* at 12. Second, it denies that the United States has a contractual duty to plaintiffs, and argues that the contract claim is insufficient in detail and should be dismissed under Rule 9(h)(3) of the Rules of the Court of Federal Claims ("RCFC"). *Id.* at 22. Third, it asserts that the six-year statute of limitations has expired because any breach of contract or fiduciary duty took place with the passage of the 1980 Act. *Id.* at 22–23.

The plaintiffs filed a cross-motion for partial summary judgment on three issues: whether the lineal descendants are the trust beneficiaries of the 1886 lands, whether the United States breached its duties as trustee, and whether the United States breached its contractual duties to plaintiffs. *See* Pls.' Cross–Mot. at 1.

Despite the class-action language in the complaint, plaintiffs have neither applied for class certification nor do they apparently intend to do so in the near future. Plaintiffs' counsel has stated that at least four different groups of plaintiffs are involved even though all plaintiffs claim to be lineal descendants: (1) members of the Shakopee community, (2) members of the Prairie Island community, (3) members of the Lower Sioux community, and (4) lineal descendants who do not belong to any of the communities. Hr'g Tr. at 48–49. For the present, plaintiffs have opted to file a motion to amend their complaint to add plaintiffs rather than to seek class certification. The motion requests leave to amend their complaint to add both additional named and anonymous plaintiffs, and asks that the court enter a protective order establishing filing procedures to protect the confidentiality of the anonymous "John Doe" and "Jane Doe" plaintiffs. In support of the amendment, plaintiffs claim that those who are members of communities fear that their involvement will be seen as action adverse to the communities and that their membership in the communities will be terminated and those lineal descendants among them who are not members of communities fear that the communities will deny their membership applications if their involvement in this case is known. Hr'g Tr. at 88–89.

A hearing on the pending motions was held on June 24, 2004, and, at the court's specific request, supplemental briefs were filed thereafter by the parties on the applicability *vel non* of the "Indian Trust Accounting Statute" that was initially enacted in 1990 as part of the annual appropriations act for the Department of Interior and has been adopted each year thereafter. *See, e.g., Shoshone Indian Tribe v. United States,* 364 F.3d 1339, 1344 & n. 2 (Fed.Cir.2004). The current version of the Indian Trust Accounting Statute, enacted as part of the Department of the Interior and Related Agencies Appropria-

tions Act, Pub.L. No. 108–108, provides as follows:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including a claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub.L. No. 108–108, 117 Stat. 1241, 1263 (Nov. 10, 2003) (emphasis added).[10] The parties' supplemental briefing was completed in August. Thereafter, each of the three communities and Mr. Cermak filed their motions for leave to participate as amicus curiae, and those motions were briefed.

### ANALYSIS

#### Standards for Decision

Plaintiffs bear the burden of establishing the court's subject matter jurisdiction over the claim. See McNutt v. General Motors Acceptance Corp. of Ind., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Ware v. United States, 57 Fed.Cl. 782, 784 (2003); Bond v. United States, 43 Fed.Cl. 346, 348 (1999). In determining whether it has jurisdiction over a case under RCFC 12(b)(1) or 12(b)(6), a federal court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiffs. See Henke v. United States, 60 F.3d 795, 797 (Fed.Cir.1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint ... are challenged." Moyer v. United States, 190 F.3d 1314, 1318 (Fed.Cir.1999) (citing Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed.Cir. 1988)).

Jurisdiction over a claim against the United States requires a waiver of sovereign immunity and the existence of a cause of action that falls within the scope of that waiver. United States v. White Mountain Apache Tribe, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). Such a waiver may not be inferred, but must be " 'unequivocally expressed.' " United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("Mitchell I") (quoting United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). The Tucker Act and the Indian Tucker Act both constitute such waivers, but any invocation of jurisdiction under those Acts must be accompanied by a corresponding substantive claim that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." United States v. Mitchell, 463 U.S. 206, 217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("Mitchell II") (quoting United States v. Testan, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)).

In assessing a motion to dismiss for failure to state a claim upon which relief can be granted, the court's " 'task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " Swierkiewicz v. Sorema, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Scheuer, 416 U.S. at 236, 94 S.Ct. 1683). A motion to dismiss under RCFC 12(b)(6) should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Summary judgment is appropriate when evidentiary materials filed in a case reveal that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

**10.** The Federal Circuit in Shoshone addressed an identical statutory provision enacted as part of the appropriations made for the Department of Interior for 2003. See 364 F.3d at 1344 (quoting from Pub.L. No. 108–7). The prior versions were also identical, except, as the Federal Circuit noted, the original version adopted in 1990 did not contain the clause "from which the beneficiary can determine whether there has been a loss," which clause was added in 1991, nor did it incorporate the clause "including any claim in litigation pending on the date of this Act," which clause was added in 1993. See Shoshone, 364 F.3d at 1344.

RCFC 56(c). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If no rational trier of fact could find for the non-moving party, summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court should resolve any doubts in making this determination in favor of the non-moving party. *Id.* at 587–88, 106 S.Ct. 1348.

In addition, "[a]lthough evidence presented by a non-movant in relation to a summary judgment motion need not be admissible at trial, the [c]ourt may not grant summary judgment to a moving party based solely on evidence that arguably may not be addressed and admitted at trial." *Bannum, Inc. v. United States,* 59 Fed.Cl. 241, 244 (2003) (citing *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Conoco, Inc. v. Department of Energy,* 99 F.3d 387, 393–95 (Fed.Cir.1996)). "Since the burden is on the party moving for summary judgment to demonstrate that there is no genuine issue of material fact, the movant also must show that the content of his affidavits would be admissible at trial." 10B Charles Wright, *et al., Federal Practice and Procedure: Civil 3d* § 2738, at 342 (1988).

### Amici Curiae

■ The Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Community have each moved for leave to participate as *amicus curiae,* as has Raymond Cermak,

Sr., an individual who claims to be a lineal descendant of loyal Mdewakanton and who previously received trust monies from the government but is not an enrolled member of any of the three communities. Unlike intervention under RCFC 24(a), there is no right to participate as an *amicus curiae;* the decision "is left entirely to the discretion of the court." *Fluor Corp. v. United States,* 35 Fed.Cl. 284, 285 (1996). *See also United States ex rel. Roby v. Boeing Co.,* 73 F.Supp.2d 897, 900 (S.D.Ohio 1999); *American Satellite Co. v. United States,* 22 Cl.Ct. 547, 549 (1991).[11] In exercising this discretion, courts have considered such factors as: whether the parties oppose the motion, the strength of information and argument presented by the potential *amicus curiae's* interests, the partisanship of the moving entity, the adequacy of the current representation, the timeliness of the motion, and, perhaps most importantly, the usefulness of information and argument presented by the potential *amicus curiae* to the court. *Fluor,* 35 Fed.Cl. at 285; *American Satellite,* 22 Cl.Ct. at 549.

■ Several of these factors weigh in favor of granting leave. The communities' interests are strong in this case. Unlike in *American Satellite,* where the moving entity was similarly situated to the plaintiff and anticipated filing its own suit, the communities have an interest in this court's interpretation of the 1980 Act because they treat the land and other property addressed by that Act as inhering in them as of right. Shakopee and Prairie Island Mot. at 1–2. *See American Satellite,* 22 Cl.Ct. at 548. In addition, the communities' briefs may well be useful to the court. When *amici* have "spe-

---

11. Rule 24(a)(2) permits intervention of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." The Shakopee and Prairie Island Communities state that they opted not to intervene because "this Court does not possess jurisdiction to declare the Tribes as the equitable title holder and trust beneficiary of the lands at issue." Shakopee and Prairie Island Reply at 2–3.

In plaintiffs' opposition to Mr. Cermak's motion for leave to participate as *amicus curiae,* plaintiffs contend that "if Ray Cermak is truly concerned about matters in this case that may affect him, then he can move to intervene as a plaintiff—as long as he can prove he is a lineal descendant of a person on the May 20, 1886 Minnesota Mdewakanton census." Pls.' Opp. to Mot. of Raymond Cermak at 2 (footnote omitted). Nonetheless, Mr. Cermak has chosen not to seek to intervene at this stage of the proceeding.

cialized knowledge which may be beneficial to the court in the resolution" of the case, granting a motion for leave is usually appropriate. *See Hage v. United States,* 35 Fed. Cl. 737, 742 (1996). Here, the communities have detailed experience with the more recent events constituting part of the complex history involved in this case, and Mr. Cermak claims detailed experience with the pre–1980 regime under which the Department of Interior administered the 1886 lands and monies. Both the communities' perspectives and that of Mr. Cermak may assist the court in gathering a more fully balanced set of views on the disputed issues.

Some of the factors mitigate against granting leave to file. The communities are partisan in this case. Unlike appellate courts, trial courts "have frowned on participation which simply allows the amicus to litigate its own views." *American Satellite,* 22 Cl.Ct. at 549. The Shakopee and Prairie Island Communities also readily admit their support of the position of the United States, albeit from a quite different perspective. Shakopee and Prairie Island Reply at 2. The government has adequately represented the communities' interests and presumably will continue to do so. Trial courts are more likely to grant leave when they are "concerned that one of the parties is not interested in or capable of fully presenting one side of the argument." *Fluor,* 35 Fed.Cl. at 286 (quoting *American Satellite,* 22 Cl.Ct. at 549). The communities disagree with the United States' litigation strategy, but that concern may not be of importance in the resolution of the case. Shakopee and Prairie Island Reply at 4–5; *American Satellite,* 22 Cl.Ct. at 549. Again, by contrast, Mr. Cermak's posture more nearly fits with that of the plaintiffs although his approach hardly matches the plaintiffs' arguments.

Timeliness also is a concern, but appears not to be an insurmountable obstacle to participation. The motions for leave were filed by the communities on August 31, 2004, after all briefing had been completed on the pending motion and cross-motion, including the supplemental briefing that occurred following the hearing on those motions. Mr. Cermak's motion was not filed until October 5, 2004.

Nonetheless, the ensuing delay has amounted to no more than several months.

Several factors are neutral, or nearly so. Plaintiffs oppose the filing of *amicus curiae* briefs, while the government has not filed a brief on the subject. Plaintiffs aver that the "United States has expressed indifference" to the communities' motions, Pls.' Resp. to Mot. for Leave at 4, while the communities assert that the government "welcomes the Tribes as *amicus curiae.*" Shakopee and Prairie Island Reply at 1.

On balance, the court will grant the communities' motions for leave, along with Mr. Cermak's motion. The communities' and Mr. Cermak's perspectives may be potentially useful. This consideration outweighs the opposition by plaintiffs and the communities' partisanship in approaching the issues. The Lower Sioux Community's motion for leave to file a memorandum as *amicus curiae* is granted. The Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and Mr. Cermak each moved to participate as *amicus curiae* without specifying the scope of their request. Their motions are granted, limited to the filing of briefs. For the communities and Mr. Cermak to participate in any manner extending beyond the filing of the proffered briefs, they must file motions explaining the specific benefits to the court of their proposed additional contribution to the proceedings in this case.

*Standing*

 In their *amicus* brief, the Prairie Island and Shakopee Communities challenge the plaintiffs' standing to present their claims. *See* Shakopee and Prairie Island *Amici* Br. at 5–7. For plaintiffs to have standing under the Constitution, they must satisfy three requirements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). First, plaintiffs must suffer "injury in fact"—an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Second, the injury must be "'fairly ... traceable to the challenged action of the defendant.'" *Id.* at 560–61, 112 S.Ct. 2130 (quoting *Simon*

v. *Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Third, a favorable decision for the plaintiff must be likely to redress the injury. *Id.* at 561, 112 S.Ct. 2130. Plaintiffs' case satisfies each of these elements. The plaintiffs allege that they have suffered a concrete and actual injury in fact—financial harm. Am. Compl. ¶¶ 42, 56. Moreover, this financial harm was allegedly caused by the defendant's breach of its fiduciary and contractual duties, and awarding the plaintiffs damages is likely to redress that harm by restoring their financial position, at least in part. *Id.*

*Amici* make three principal arguments, each of which fails to undermine plaintiffs' claim to standing. First, they argue that because plaintiffs are asserting group rights, they must represent the entire group. Because the plaintiffs have advised that, for the present, they will not seek class certification, *amici* assert that they do not represent the entire group of lineal descendants. Shakopee and Prairie Island Br. at 6. *Amici* rely on *Cherokee Nation v. United States*, 92 Ct.Cl. 262, 1940 WL 4122 (1940), in which the court dismissed a claim because the entire Cherokee tribe did not participate. However, the statute granting jurisdiction to this court's predecessor in *Cherokee Nation* explicitly required that the entire tribe bring suit. The court held that "the legislation authorizing an action to be brought by the tribe by its express terms permits only a suit by the tribe for the recovery of a judgment, if it is entitled to one, for the benefit of the whole tribe and not for certain individuals as members of the tribe." *Id.* at 268. "In other words, the jurisdictional act authorizes only the making and the adjudication of tribal claims." *Id.* at 268–69. In contrast, the loyal Mdewakanton, to qualify as beneficiaries of the 1888, 1889, and 1890 Acts, expressly had to abjure their relationship to *any* tribe; they were obligated to sever their tribal relations. *See, e.g.,* Act of June 29, 1888; 25 Stat. 217, 228 (providing support for those full-blooded Mdewakanton who have resided in Minnesota since May 20, 1886 "and [have] severed their tribal relations"); Pls.' Ex. 30, at 1 (stating in a Letter from Mariana Shulstad for the Field Solicitor to Edwin Demery, Area Director, Bureau of Indian Affairs (Nov. 8, 1978), that the 1886 lands were purchased for the "benefit of those Mdewakanton Sioux individuals who had severed relations with their tribe"). Also, in this case jurisdiction is not grounded in a limited waiver by Congress, unlike in *Cherokee Nation* or in the *Sisseton* and *Medawakanton* annuity cases. Instead, jurisdiction is premised upon the more general waivers of sovereign immunity found in the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505.

Second, *amici* challenge the "injury in fact" suffered by those lineal descendants who also belong to one of the communities. According to this argument, these plaintiffs "are already eligible to share in the lands under the inherent and [c]onstitutional authority exercised by each [t]ribal government." Shakopee and Prairie Island Br. at 6. This eligibility supposedly bars such plaintiffs from suffering any injury. However, this argument improperly belittles plaintiffs' claims: the benefits some plaintiffs receive as members of one of the communities may be substantially less than, or different from, those which they would receive as a lineal descendant. *See, e.g.,* Pls.' Resp. to Mot. for Leave at 21. Although the court has not made any factual findings regarding the veracity of *amici's* contention, plaintiffs' allegations of financial and other harm are sufficient to provide standing. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' ")).

Third, the *amici* claim that the plaintiffs who belong to the communities have no redressable claim because they have not severed tribal relations and because the communities do not permit dual enrollment. Shakopee and Prairie Island Br. at 6–7. This argument is sophistic and pulls historical circumstances out of context. To be a beneficiary of the 1888, 1889, and 1890 Acts, a Mdewakanton must have severed tribal relations. *See, e.g.,* Act of June 29, 1888, 25 Stat. at 228; Pls.' Ex. 30, at 1. This requirement applied to the original trust beneficia-

ries. It reaches through time to the present day only for limited purposes, *viz.,* it was the principle governing eligibility for inclusion in the 1886 census, and it now defines the group of individual persons eligible to bring a claim. Moreover, the communities' prohibitions on dual enrollment do not affect the lineal descendants because their alleged status as a beneficiary of a trust does not constitute a separate enrollment.

In short, each of the arguments of *amici* directed against plaintiffs' standing to bring their claims lacks merit and is unavailing. Plaintiffs have standing to pursue their claims.

### Jurisdiction

### A. Statutory Predicates for Suit

■ The government challenges the court's jurisdiction, arguing that the plaintiffs' claims fall outside the jurisdictional grants of the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505. As explained above, the United States must waive sovereign immunity to be bound by damage judgments, and such waiver must be explicit. *See supra,* at 535. Both Acts apply and provide the requisite waiver of sovereign immunity. The Tucker Act grants this court jurisdiction over claims "against the United States founded ... [on] any Act of Congress or any regulation of an executive department ... or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Plaintiffs' first claim is founded on an action for damages not sounding in tort, namely, breach of fiduciary duty, and their second claim alleges breach of a contract with the government.[12] The Tucker Act itself does not provide the substantive law to be applied; rather, trust and contract law supply that framework. *See Confederated Tribes of Warm Springs Reservation of Oregon v. United States,* 248 F.3d 1365, 1371 (Fed.Cir.2001). Because the Tucker Act " 'itself provides the necessary consent' to suit ... the rights-creating statute or regulation need not contain 'a second waiver of sovereign immunity.' " *United States v. Navajo Nation,* 537 U.S. 488, 503, 123 S.Ct. 1079, 155

L.Ed.2d 60 (2003) (quoting *Mitchell II,* 463 U.S. at 218–19, 103 S.Ct. 2961).

The Indian Tucker Act also provides a basis for this court's jurisdiction over the claims in this case. 28 U.S.C. § 1505 grants jurisdiction over "any claim" brought by

> *any* tribe, band, or other *identifiable group of American Indians* residing within the territorial limits of the United States or Alaska *whenever such claim is one arising under the Constitution, laws or treaties of the United States,* or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

(Emphasis added.)

The government asserts that the lineal descendants of the loyal Mdewakanton do not have a right to sue under the Indian Tucker Act because they "are individual Indians and not a tribal group." Def.'s Mot. to Dismiss at 12. Congress was able to identify the loyal Mdewakanton and their lineal descendants in the Acts of 1888, 1889, 1890, and 1901. Moreover, plaintiffs need not be an organized unit to claim jurisdiction under the Indian Tucker Act. *See Tee–Hit–Ton Indians v. United States,* 128 Ct.Cl. 82, 120 F.Supp. 202, 204 (1954) (holding that the descendants of the earliest known native inhabitants of an area of land in southeastern Alaska satisfied the "identifiable group" requirement). In addition, the alleged divestiture of rights occurring after the 1980 Act does not elide any jurisdiction that would arise under the Indian Tucker Act. *See Menominee Tribe v. United States,* 179 Ct.Cl. 496, 388 F.2d 998, 1001 (1967) (holding that despite the Menominee Termination Act, which terminated federal supervision over the tribe's property, the Menominee Tribe still could invoke jurisdiction under the Indian Tucker Act, in part because "[t]he tribe continues to hold the beneficial and equitable interest in the property").

Correlatively, the government argues that individual Indians are not permitted to bring

---

12. The government also contends that the alleged breach of fiduciary duty is not a "money-mandating duty" under *Mitchell I, Mitchell II,*

and *White Mountain Apache.* This contention is addressed below.

*personal* claims under 28 U.S.C. § 1505. *See Fields v. United States,* 191 Ct.Cl. 191, 423 F.2d 380, 383 (1970) (holding that the alleged heirs of an individual plaintiff could not invoke jurisdiction under the Indian Tucker Act, but could bring claims under the Tucker Act); *Cherokee Freedmen v. United States,* 161 Ct.Cl. 787, 1963 WL 8556 (1963) (holding, on an appeal from the Indian Claims Commission, that claims by Cherokee Freedmen that the Dawes Commission should have enrolled them as members of the Cherokee Nation were correctly dismissed as individual and not group claims). This challenge also fails, however, because plaintiffs bring their claims specifically and solely as members of a group. Unlike in *Cherokee Freedmen,* where the plaintiffs' case consisted of "individual claims dependent upon the individual facts and circumstances pertinent to the particular person asserting that he (or his ancestor) was wrongfully denied enrollment," 161 Ct. Cl. at 789, this case involves questions of a particular and discrete group's rights under various Acts of Congress. Whereas in *Cherokee Freedmen* "[t]here [was] no common right or group interest," *id.,* the lineal descendants of the loyal Mdewakanton have a collective interest in ascertaining whether the government had a fiduciary duty to them and whether that fiduciary duty has been violated or abridged. The lineal descendants are unable to sue as a tribe because they necessarily had to sever their tribal relations prior to 1886 to qualify as beneficiaries of the 1888, 1889, and 1890 Acts, but they were and still remain an identifiable group of American Indians.

Moreover, the fact that this case is not currently certified as a class action does not change the court's adjudication of questions common to the entire group. The court must determine whether the group (comprised of numerous individuals) is the beneficiary of a trust, whether the group has contracted with the United States government, and what if any rights the group has under such trust or contract. Thus, in this case the scope of the inquiry into group rights far exceeds that in *Fields* and *Cherokee Freedmen.* It is much more analogous to the situation in *Tee–Hit–Ton,* where the court concluded that "some, at least, of the land exploited by the Tee-

[H]it-[T]on was claimed by the plaintiff clan as a whole, and that it is, therefore, an identifiable group of Indians within the meaning of the statute." 120 F.Supp. at 204. Because determinations comparable to those in *Tee–Hit–Ton* are necessarily implicated by the claims in this case, jurisdiction is appropriate under the Indian Tucker Act.

### B. Nature of Plaintiffs' Claims

#### 1. Breach of fiduciary duty.

The plaintiffs allege that the 1886 property constituted the principal of a trust, with legal title in the United States, but with equitable title in the loyal Mdewakanton and their lineal descendants. The government allegedly breached its fiduciary duty in 1980 and thereafter by transferring control of trust assets to the communities and permitting non-descendants to receive profits from casinos and other ventures on the lands in question. Am. Compl. ¶¶ 35–41. The government challenges this claim in three principal ways. First, it argues that the 1886 lands were never held in trust for the loyal Mdewakanton, and that the United States always held both legal and equitable title to the land. Def.'s Mot. to Dismiss at 16–20. The Acts of 1888, 1889, and 1890, according to this argument, extended benefits to those who satisfied the requirements of the Acts, but not to their lineal descendants. *Id.* at 19. Second, the government interprets the 1980 Act as extinguishing any fiduciary duty the government owed to the lineal descendants. *Id.* at 13–16. Third, it contends that any duty the government still owes to the lineal descendants is not a money-mandating duty, and therefore the court lacks jurisdiction. *Id.* at 12–22. Each of these arguments is examined in turn.

#### (a) Existence of a trust.

■ Contrary to the government's assertions, the arrangement between the loyal Mdewakanton and the government includes all of the features of a trust. "Where ... the relevant sources of substantive law create '[a]ll of the necessary elements of a common-law trust,' there is no need to look elsewhere for the source of a trust relationship." *White Mountain Apache,* 537 U.S. at 476 n. 3, 123

S.Ct. 1126. The three traditional elements of a trust are a trustee, beneficiaries, and trust property, also known as the corpus. *See Restatement (Third) of Trusts* § 2 cmt. f. The trustee manages the corpus in the best interests of the beneficiaries in accordance with the guidelines for and purposes of the trust. *Id.* In this case, the United States created a trust in which it acted as trustee, the loyal Mdewakanton and their lineal descendants were, and arguably are, the beneficiaries, and the corpus includes property, improvements to property, and money.

The 1888, 1889, and 1890 Acts in combination have three key features that show the creation of a trust. First, the 1888 Act calls upon the Secretary of Interior to expend the appropriated funds for the Mdewakanton "as in his judgment he may deem best." Act of 1888, 25 Stat. at 228–29. Similar provisions were included in the 1889 and 1890 Acts. *See* Act of 1889, 25 Stat. at 992–93 (calling for the money to be expended by the Secretary of Interior "as may be deemed best in the case of each of these Indians or family thereof"); Act of 1890, 26 Stat. at 349 ("as in his judgment he may think best"). This language functionally appoints the Secretary of Interior to serve as the trustee to spend the funds on behalf of the beneficiaries, the loyal Mdewakanton. Second, the Acts of 1889 and 1890 call for "each of the Indians in this paragraph [to receive] as nearly as practicable, an equal amount in value of this appropriation and that made by [the 1888 Act]." *See* Act of 1889, 25 Stat. at 992–93. This provision operates as a guideline for the trustee: he or she must ensure that the corpus is distributed equally to the extent possible. Third, in order to ensure that the proceeds from the 1889 and 1890 appropriations went to the beneficiaries, Congress inserted an additional clause providing that if the funds were not all spent during the fiscal year, they "shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians." Act of 1889, 25 Stat. at 992. This clause aids in defining the corpus of the trust by directing that all of the funds allocated be used for the benefit of the loyal Mdewakanton, even if basic necessities had already been provided for them.

An analysis of the history behind Congress's enacted laws also reveals the creation of a trust. During debate on the 1888 Act, Rep. MacDonald referred to the Mdewakanton as "beneficiaries" of the 1888 Act. 19 Cong. Rec. H2977 (daily ed. Apr. 14, 1888) (statement of Rep. MacDonald). "The actual purchase of land under these appropriations began in April, 1889." *History of the Santee* at 282. As the purchases progressed, Congress seems to have kept watch over the results because the 1890 Appropriations Act specified that $2,000 of the $8,000 that was appropriated was designated to be expended for the Prairie Island settlement. *Id.* In addition, the property buyer, Robert B. Henton, observed that several prior purchases that had been deeded directly to the loyal Mdewakanton, *see supra*, at 528 n. 7, had been sold or mortgaged. *History of the Santee* at 283. Accordingly, Mr. Henton considered that title to future purchases should be retained by the government, and that policy was followed thereafter. *Id.*

The 1901 Act by Congress further reflected Congress's understanding that the 1886 lands were held in trust for the Mdewakanton. In connection with passage of that Act, Senator Pettigrew commented that "[t]he land was purchased for their benefit, and the title is in them subject to a provision by which they can not convey it." 34 Cong. Rec. 2523 (1901). This statement reflects an explicit understanding that the loyal Mdewakanton had equitable title to the 1886 property as beneficiaries. The 1901 Act empowered the Secretary of the Interior to sell certain land provided "the written consent of the adult Indians residing in Redwood County, Minnesota, shall first be given." Act of 1901, 31 Stat. at 805, 806. A basic precept of trust law is that partial termination of a trust requires the consent of all the beneficiaries. *See Restatement (Third) of Trusts* § 65(1) ("if all of the beneficiaries of an irrevocable trust consent, they can compel the termination or modification of the trust").

The Department of Interior's practice in addressing the 1886 lands and other property has also been consistent with the formation of a trust. The Land Certificates that as-

signed 1886 land to individuals expressly stated that the land "is to be *held in trust, by the Secretary of the Interior*, for the exclusive use and benefit of the said Indian." *See* Pls.' Ex. 35 (emphasis added). A March 1974 Memorandum from the Acting Associate Solicitor for Indian Affairs to the Commissioner of Indian Affairs concluded that "[t]he lands *are held in trust by the United States* with the Secretary possessing a special power of appointment among members of a definite class." Pls.' Ex. 29, at 5 (emphasis added). An additional letter written in 1978 for the Field Solicitor to the Minneapolis Area Director of the Bureau of Indian Affairs emphasized that "none of the three Community governments, organized under the Indian Reorganization Act and operating under constitutions and bylaws, has any right, title, or interest in these lands. *The land is held for the benefit of a specific class of people and their descendants.*" Pls.' Ex. 30, at 1–2 (emphasis added). These memoranda only scratch the surface of the numerous documents that plaintiffs have provided to the court that reflect the Department of Interior's pre–1980 interpretation of the 1888, 1889, and 1890 Acts, namely, that the United States held the 1886 lands in trust for the loyal Mdewakanton and their lineal descendants. The court has not been provided with any evidence to the contrary. Thus, the court necessarily concludes that there is no genuine dispute of material fact that a trust was created and that the government held the 1886 lands, the 1886 monies, and the other 1886 property in trust.

The government challenges the plaintiffs' contention that the lineal descendants are beneficiaries of the trust, claiming that the land was purchased only for the Mdewakanton who satisfied the conditions of the 1888, 1889, and 1890 Acts, and that their descendants are not beneficiaries of any trust. Def.'s Mot. to Dismiss at 19. However, the language of the Acts themselves and the consistent, lengthy administration by the Department of Interior of the 1886 lands, monies, and other property support the plaintiffs' view that the lineal descendants are beneficiaries. The 1863 Act, which first attempted to provide for the loyal Mdewakanton, sought to provide land that would serve

as "an inheritance to said Indians *and their heirs* forever." 12 Stat. at 654 (emphasis added). The 1888 Act was motivated in part by the fact that the 1863 Act was not successfully implemented. 19 Cong. Rec. H2976–77 (daily ed. Apr. 14, 1888) (statement of Rep. MacDonald). The 1889 and 1890 Acts also called upon the Secretary of Interior to expend the money on behalf of the "Indians *or family thereof.*" Act of 1889, 25 Stat. at 992 (emphasis added). Because the 1886 lands used an assignment system instead of an allotment system, Congress used the word "family" rather than "heirs," which was used in the 1863 Act. However, in this context, the Indian Land Certificates that implemented the 1888, 1889, and 1890 Acts certified that an assignee "*and his heirs* are entitled to immediate possession of said land." Pls.' Ex. 35 (emphasis added).

The uniformly consistent practice of the Department of Interior over a ninety-year span reinforces the view that lineal descendants are beneficiaries. Upon the death of a landholder, the Department frequently passed the land along to the children. *See, e.g.,* Pls.' Ex. 34, at 22. The 1955 Minneapolis Area Office Indian Affairs Manual claimed that to be eligible for an assignment, an applicant must be "a member of the Mdewakanton Band of Sioux, must have been [a] resident of the State of Minnesota on May 20, 1886, in the actual process of moving to the State of Minnesota, *or the descendant of such resident.*" Pls.' Ex. 25, at 0041046 (emphasis added). Internal memoranda of the Department further support this view. A 1971 memorandum from the Acting Associate Solicitor to the Field Solicitor said that "only descendants of Mdewakanton who resided in Minnesota on May 20, 1886, are eligible for land assignments at Shakopee." Pls.' Ex. 20, at 1. A 1978 memorandum for the Field Solicitor to the Minneapolis Area Director of the Bureau of Indian Affairs stressed that the 1886 lands are "held for the benefit of a specific class of people *and their descendants.*" Pls.' Ex. 30, at 2. The court has been provided with no evidence contravening these and other similar documentary materials reflecting long-standing practice. In short, the 1888, 1889, and 1890 Acts created a

trust, and the beneficiaries are the loyal Mdewakanton and their lineal descendants.

#### (b) *The 1980 Act.*

■ The government repeatedly claims that the 1980 Act terminated any trust that existed for the Mdewakanton. *See, e.g.,* Def.'s Mot. to Dismiss at 13–16. This argument fails to acknowledge the actual language of the 1980 Act. When the United States terminated trusts in the past, Congress typically used far more explicit language than that of the 1980 Act. *See, e.g.,* 25 U.S.C. § 677 ("The purpose of this subchapter is to provide for ... the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said [Ute] tribe."); 25 U.S.C. § 564 ("The purpose of this subchapter is to provide for the termination of Federal supervision over the trust and restricted property of the Klamath Tribe of Indians."). In contrast, the 1980 Act stated that certain lands currently "held by the United States for the use or benefit of certain Mdewakanton Sioux Indians under the [1888, 1889, and 1890 Acts] are hereby declared to hereafter be held by the United States" in trust for the communities. 94 Stat. at 3262. The 1980 Act does not state as its purpose that the trust for the Mdewakanton would be terminated. Furthermore, the government's interpretation is inconsistent with the 1901 Act, which required the consent of the loyal Mdewakanton before the sale of designated land. Such consent is generally required to terminate a trust, and was not received here. *See Restatement (Third) of Trusts* § 65(1). The government's theory also does not explain the existence of a savings clause. Section 3 of the 1980 Act states that nothing in the Act shall "alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act." 94 Stat. at 3262. This language covered more than pre–1980 assignments to lineal descendants. By its terms it saved pre–1980 contracts, leases, and assignments to *non*-descendants, which assignments generated proceeds that were gathered by the Department of Interior and then split among lineal descendants. These omis-

sions indicate that the 1980 Act did not terminate the trust.

In addition, as plaintiffs have pointed out, the language of the 1980 Act implies that the lineal descendants' equitable title was not transferred. The 1980 Act transfers "all right, title, and interest *of the United States*" in the 1886 lands to the United States in trust for the communities. 94 Stat. at 3262 (emphasis added). Because the trust was created by the 1888, 1889, and 1890 Acts for the loyal Mdewakanton, legal title was in the United States but equitable title was held by the loyal Mdewakanton and their lineal descendants. When the 1980 Act transferred the United States' right, title, and interest in land, that interest appears *not* to have included the equitable title to the 1886 lands, because the 1980 statute stated that the United States was transferring only that interest it possessed before the Act. Furthermore, the sole object of the Act's transfer is the 1886 lands, "including any structures or other improvements of the United States on such lands." *Id.* Notably, this description does not include the monies that were, and are, part of the trust's corpus. This omission further indicates that the trust persists.

■ The Department of Interior interpreted the 1980 Act to shift the authority to determine the uses of the land from the Department of Interior to the three communities. Repeals by implication are not favored by this court, and when " 'two statutes are capable of co-existence, it is the clear duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Liesegang v. Secretary of Veterans Affairs,* 312 F.3d 1368, 1374 (Fed.Cir.2002) (quoting *Horner v. Jeffrey,* 823 F.2d 1521, 1527–28 (Fed.Cir.1987)). Absent an explicitly expressed intention by Congress to terminate the trust, the court will endeavor to reconcile the trust created by the Acts of 1888, 1889, and 1890, as well as the consent requirement in the 1901 Act, with the 1980 Act. For the present, it is enough to conclude that the 1980 Act did not terminate the trust created respecting the 1886 property and that the United States still

retains its powers and obligations as trustee regarding 1886 property.[13]

### (c) *Money-mandating duty.*

■ The government vigorously argues that the United States does not owe a "money-mandating" duty to the plaintiffs. Def.'s Mot. to Dismiss at 10–20. For this court to have jurisdiction over a case, the United States must waive its sovereign immunity; the Tucker Act constitutes such a waiver, but only if the plaintiffs' substantive right comes from another source of law. *See Mitchell II,* 463 U.S. at 216, 103 S.Ct. 2961.

The Supreme Court in *Mitchell II* held that the source of substantive law must "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Id.* at 218, 103 S.Ct. 2961. Twenty years later, the majority in *White Mountain Apache* stated that "[i]t is enough, then, that a statute creating a Tucker Act right be *reasonably amenable* to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred' ... a fair inference will do." 537 U.S. at 473, 123 S.Ct. 1126 (emphasis added). The Federal Circuit has interpreted *White Mountain Apache* to redefine the test from *Mitchell II:*

> The previous test of 'fairly interpreted as mandating compensation' is now stated as whether the statute in question is 'reasonably amenable to the reading that it mandates a right to recovery in damages'.... The new test clearly lowers the threshold for establishing that a statute or regulation is money-mandating, for it replaces a nor-

mal 'fairly interpreted' test with a less demanding test of 'reasonable amenability' based on 'fair inferences.'

*Fisher v. United States,* 364 F.3d 1372, 1377 (Fed.Cir.2004).[14] The government interprets *White Mountain Apache* to require a two-step inquiry: first, the court decides whether the government owed a duty to the plaintiff, and second, it determines whether the substantive law can be fairly interpreted as mandating compensation where that duty is breached. Def.'s Reply at 15; *see also White Mountain Apache,* 537 U.S. at 479–80, 123 S.Ct. 1126 (Ginsburg, J., concurring). In the present case, the plaintiffs have established that the United States had a money-mandating duty to them.[15]

First, the United States owes a fiduciary duty to the plaintiffs. The previous discussion describes in detail the United States' creation of a trust along with accompanying fiduciary duties. *See supra,* at 540–43. The United States' obligations in this case are more demanding than those in *White Mountain Apache* and *Mitchell II,* in both of which enforceable fiduciary duties were found to exist. *Mitchell II* held that various congressional acts imposed a fiduciary duty on the government regarding timber sales, among other things citing a "1910 Act [that] empowered the Secretary to sell timber on unallotted lands and apply the proceeds of the sales for the benefit of the Indians." 463 U.S. at 220, 103 S.Ct. 2961. That Act is similar to the 1901 Act empowering the Secretary of Interior to sell lands on behalf of the loyal Mdewakanton, provided he acquired their

---

13. It may be that the 1980 Act created a trust on a trust, but that possibility and others must be remitted to exploration in future proceedings. The 1980 Act is so poorly drafted that it is difficult to make sense of its provisions. In addition, here as in *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980),

> [t]he principles that it "must [be] presume[d] that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that [it] exercised its best judgment in the premises," *Lone Wolf v. Hitchcock,* 187 U.S. 553, 568, 23 S.Ct. 216, 222, 47 L.Ed. 299, are inapplicable in this case.

*Id.* at 373, 100 S.Ct. 2716.

14. A principal divergence between the majority and the dissent in *Fisher* is whether this lower threshold should satisfy both a jurisdictional challenge under RCFC 12(b)(1) and a challenge on the merits under 12(b)(6), or apply only to the jurisdictional inquiry. *Id.* at 1377–78. The majority deferred this question because it was unnecessary to a ruling in the *Fisher* case. *Id.* at 1378. The dissenting judge would have reached the question and decided that the less rigorous test should be applied to the merits as well as to the jurisdictional determination. *Id.* at 1387, 1389–90 (Dyk, J. dissenting).

15. This is so regardless of which of the *Fisher* variants of the *White Mountain Apache* standard is applied. *See supra,* n. 14.

consent. Act of Feb. 25, 1901, 31 Stat. 805–06. The court in *Mitchell II* also took account of regulations promulgated by the Office of Indian Affairs, arguing that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians." 463 U.S. at 220, 225, 103 S.Ct. 2961. Similarly, the Minneapolis Area Office for Indian Affairs issued regulations "to provide procedures for the issuing of certificates covering Minnesota Mdewakanton Sioux assignments." Pls.' Ex. 25, at 1. *White Mountain Apache* held that the United States had a money-mandating duty regarding approximately thirty buildings on the former Fort Apache Military Reservation that were held in trust by the United States for the White Mountain Apache Tribe but occupied by the United States. The Supreme Court determined that the government was invested "with discretionary authority to make direct use of portions of the trust corpus. The trust property is subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes." *White Mountain Apache,* 537 U.S. at 475, 123 S.Ct. 1126 (internal quotations and citations omitted). Similarly, the Secretary of Interior had a reasonably well delineated discretion in his or her duties as trustee for the Mdewakanton.

By contrast, in *Navajo Nation,* decided by the Supreme Court on the same day as *White Mountain Apache,* the United States had a much lesser role in managing property. *Navajo Nation* held that the Indian Mineral Leasing Act (IMLA) did not confer a fiduciary duty upon the United States, emphasizing that "[t]he Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure 'the needs and best interests of the Indian owner and his heirs.' " 537 U.S. at 507–08, 123 S.Ct. 1079. In contrast, the 1889 and 1890 Acts called for the Secretary of Interior to allocate the trust corpus "as may be deemed best in the case of each of these Indians or family thereof." Act of 1889, 25 Stat. at 992; Act of 1890, 26 Stat. at 349.[16]

Second, once a duty has been shown, the next question is whether the source of law may "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell II,* 463 U.S. at 218, 103 S.Ct. 2961. Once it has been shown that the government owes a fiduciary duty as a trustee to a group of plaintiffs, mandatory compensation for a breach of that duty is ordinarily a logical and fair interpretation of the underlying statutory provisions. *See, e.g., id.* at 226, 103 S.Ct. 2961 ("Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties."). "[E]lementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *White Mountain Apache,* 537 U.S. at 475, 123 S.Ct. 1126. In this case also, having found that a fiduciary relationship exists, a money-mandating duty follows as a matter of course. Here, there is additionally a direct statutory predicate for a money-mandating duty. The requirement in the 1889 and 1890 Appropriations Acts that if the funds were not all spent during the fiscal year, they must nonetheless be used to support the Mdewakanton, further indicates that if the proceeds of the trust corpus are not used for the benefit of the Mdewakanton, compensation is appropriate. *See, e.g.,* Act of 1889, 25 Stat. at 992.

16. Similarly, *Mitchell I* held that the General Allotment Act of 1887 did not impose a fiduciary responsibility on the United States, relying on two key facts: the Indian allottee, rather than the United States, was "responsible for using the land for agricultural or grazing purposes," and the legislative history suggested that no fiduciary duty was meant to be created. 445 U.S. at 542–43, 100 S.Ct. 1349. In the case of the 1886 lands, unlike in *Mitchell I,* the United States assigned the lands as opposed to allotting them; it also was responsible for leasing the lands to others, collecting rents, and dividing the proceeds among the beneficiaries. In *Mitchell I,* respecting the statute at issue, Senator Dawes had explained "that the statute as amended would still ensure that title to the land would be transferred to the Indian allottee at the expiration of 25 years." *Id.* at 543, 100 S.Ct. 1349. No such provision enabled the Mdewakanton to acquire the land after a period of time—it was held in trust.

Moreover, as the undisputed record shows, this is not a case in which the lineal descendants of the loyal Mdewakanton were provided a substitute for their beneficial interest. In other words, this is *not* a case in which the government sought to invoke "the traditional rule that a trustee may change the form of trust assets as long as he fairly (or in good faith) attempts to provide his ward with property of equal value." *Sioux Nation*, 448 U.S. at 416, 100 S.Ct. 2716. In short, the United States has breached its fiduciary duties, and the applicable law mandates compensation. However, the record is insufficient to show the nature and extent of the breach of fiduciary duty, and it does not begin to address the posture of individual plaintiffs respecting the breach.

### 2. Breach of Contract

In addition to their claim of breach of fiduciary duty, the plaintiffs allege that the loyal Mdewakanton formed a contract with the United States in which they agreed to sever their tribal relations, express loyalty to the United States, and move onto the 1886 lands. In exchange, the United States would purchase the 1886 lands and place them in a trust for the Mdewakanton. Am. Compl. ¶¶ 11–20. Beginning in 1885, John Bluestone allegedly negotiated this contract with Special Agent Walter McLeod. *Id.* ¶ 13; Pls.' Cross–Mot. at 13. The 1886 and 1889 censuses recorded which Mdewakanton were willing to enter the contract by severing their tribal relations. Pls.' Cross–Mot. at 15–16. As plaintiffs would have it, the 1889 and 1890 Acts reflected contract modifications requested by the Mdewakanton. *Id.* at 16–17. By distributing income, profits, and proceeds arising from the 1886 lands to individuals who are not lineal descendants, the United States has allegedly breached its contractual duty to the plaintiffs. Am. Compl. ¶¶ 52–55. The lineal descendants, as intended beneficiaries of the contract, allegedly have a right to sue for this breach. Pls.' Cross–Mot. at 42.

The government denies the existence of a contract, claiming that "the [1888, 1889, and 1890] appropriations were gratuitous acts by the United States and not contractual obligations." Def.'s Mot. to Dismiss at 21. The government also argues that the plaintiffs fail to plead the contract in sufficient detail, as required by RCFC 9(h)(3) ("If the claim is founded upon a contract or treaty with the United States, [the complaint shall include] a description of the contract or treaty sufficient to identify it."). Def.'s Mot. to Dismiss at 22.

▮▮▮ A contract with the government arises only if three requirements are satisfied: (1) mutual intent to contract, including an offer and acceptance; (2) consideration; and (3) a government representative who had actual authority to bind the government. *See La Van v. United States*, 382 F.3d 1340, 1346 (Fed.Cir.2004); *American Fed. Bank, F.S.B. v. United States*, 62 Fed.Cl. 185, 194 (2004). Plaintiffs claim to meet these elements through a contract implied in fact. Pls.' Cross–Mot. at 43. Contracts implied in fact are founded upon a meeting of the minds and inferred from the conduct of the parties. *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241, 1255 (1970); *American Fed.*, 62 Fed. Cl. at 194. According to the plaintiffs, mutual intent to contract is apparent from the behavior of the respective parties, with the United States' enactment of the 1888, 1889, and 1890 Appropriations Acts and purchasing the 1886 lands, and with the Mdewakanton moving to those lands and severing their tribal relations. Pls.' Cross–Mot. at 43–44. Consideration is allegedly present because the Mdewakanton severed their tribal relations and the United States provided them land. *Id.* at 44. The government representative who allegedly negotiated the contract was United States Special Agents Walter McLeod and, subsequently, Robert Henton, both of whom supposedly had actual authority under the Acts to bind the government. *Id.* at 44–45.

On the facts as pled by the plaintiffs, it is unnecessary to explore in any detail the questions whether a contract exists between the loyal Mdewakanton and the United States or whether the complaint sets out the allegations of contractual formation in sufficient detail because plaintiffs' claim of breach of contract is barred on statute of limitations grounds. *See infra.*

*C. Statute of Limitations*

■ The government further argues that the statute of limitations had expired prior to plaintiffs' filing of their complaint. Def.'s Mot. to Dismiss at 22–23. Generally, a plaintiff must file a suit against the government within six years after the claim first accrues. 28 U.S.C. § 2501. This statute of limitations is a jurisdictional limitation on the government's waiver of sovereign immunity and therefore must be construed strictly. *See, e.g., Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed. Cir.1988). However, the Indian Trust Accounting Statute quoted *supra,* at 535, must be taken into account in addressing the generally applicable six-year statute of limitations.

The Indian Trust Accounting Statute was analyzed in much detail and with great care in the Federal Circuit's recent decision in *Shoshone Indian Tribe,* 364 F.3d 1339. As *Shoshone* held, the opening phrase "[n]otwithstanding any other provision of law" combined with the statement that the "statute of limitations shall not commence to run on any claim ... concerning losses to or mismanagement of trust funds" indicates that the specific provisions of the Indian Trust Accounting Statute trump those of 28 U.S.C. § 2501, the general statute of limitations. 364 F.3d at 1346. Second, Congress chose the phrase "shall not commence to run" as opposed to "tolls," meaning that the *beginning* of the limitations period is delayed until an accounting is provided. *Id.* at 1347. Indeed, in this regard, the Indian Trust Accounting Statute resurrects claims that may previously have been barred by the statute of limitations. This interpretation is consistent with principles of trust law, because "[b]eneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets." *Id.*

In *Shoshone,* the Federal Circuit interpreted the Indian Trust Accounting Statute to be limited to mismanagement of trust funds and to losses "resulting from the Government's failure or delay in (1) collecting payments under the sand and gravel contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment." *Id.* at 1350. This limitation led the court of appeals to hold claims of asset mismanagement time-barred: "While it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets." Id.*

In its supplemental brief in this case, the government challenges *any* applicability of the Indian Trust Accounting Statute.[17] The government asserts that the plaintiffs' claims neither involve a trust nor do they involve trust funds. Def.'s Supp. Br. at 7–10. These claims are unavailing. First, as described previously, a set of closely related appropriation acts of Congress created a trust, and plaintiffs have put at issue the government's role as trustee. Second, as to whether "trust funds" are at issue here, the government completely ignores that the Department of Interior maintained for years 1886 monies in trust accounts and paid distributions to lineal descendants of loyal Mdewakanton from those accounts. *See supra,* at 533 (quoting the Field Solicitor's letter dated February 6, 1981 to the Area Director, regarding, among other things, disposition of the 1886 monies after enactment of the 1980 Act). Moreover, the Department of Interior has adopted guidelines applicable to the administration by the Bureau of Indian Affairs of "Trust Funds For Tribes and Individual Indians." *See* 25 C.F.R. Chapter I, Part 115. Those guidelines define "[t]rust funds" as "money derived from the sale or use of trust lands, restricted fee lands, or trust resources and any other money that the Secretary must accept into trust." 25 C.F.R. § 115.002. The

17. The government's briefs filed with its motion to dismiss and in response to plaintiffs' cross-motion omitted any mention whatsoever of the Indian Trust Accounting Statute. It was not until the court requested supplemental briefing of the Indian Trust Accounting Statute at the hearing on the cross-motions that the government addressed the Statute and issues arising with its application to this case.

monies held by the Department before 1980 for lineal descendants of the loyal Mdewakanton certainly fall within that definition. In addition, plaintiffs allege instances where proceeds from activities on the 1886 lands have not been distributed in accord with the terms of the trust, including proceeds from a gravel quarry, a cigarette enterprise, a bingo casino, and the current casinos. Pls.' Supp. Br. at 6–9. These claims respecting proceeds differ from the asset-mismanagement claims at issue in *Shoshone*, which involved contentions that the United States could have secured a better price under certain leases. Trust funds are the focus of the present case. The Mdewakanton claims deal with distribution of proceeds from leasing, not the leasing itself.[18]

The government also challenges the applicability of the Indian Trust Accounting Statute because the government so openly disavowed any obligations as trustee after 1980. As the government would have it, this blatant repudiation necessarily triggered the statute of limitations such that it now has expired. Def.'s Supp. Br. at 6. The government relies on the Federal Circuit's commentary in *Shoshone* that "[a] trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee." 364 F.3d at 1348. However, this argument by the government ignores a crucial caveat by the court of appeals that followed the clause the government quotes: "[I]t is often the case, however, that the trustee can breach his fiduciary responsibilities of managing trust property without placing the beneficiary on notice that a breach has occurred. It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust." *Id.* In addition, as *Shoshone* recognizes, the Indian Trust Accounting Statute constitutes a specific exception to the traditional rules regarding applicability of statutes of limitations to claims of breach of trust. *Id.* at 1348–51. The Indian Trust Accounting Statute categorically applies

"[n]otwithstanding any other provision of law." Thus, the Indian Trust Accounting Statute resuscitates and preserves plaintiffs' claims of breach of trust, displacing 28 U.S.C. § 2501 in the process.

 The Indian Trust Accounting Statute does not apply to plaintiffs' contract claim. Because a congressional waiver of a statute of limitations must be strictly construed, *Shoshone* held that the Indian Trust Accounting Statute only applied to trust mismanagement and to specific kinds of losses. *Id.* at 1351. Plaintiffs' breach of contract claims do not fall within either category. Contrary to the plaintiffs' claims, the claims for breach of contract began to accrue in 1981 when the United States transferred the trust corpus to the communities. Lower Sioux *Amicus* Br.App. 4, at 2. The Indian Trust Accounting Statute, because of its explicit scope, cannot save the plaintiffs' contract claim, which expired in 1987.

Plaintiffs raise five additional arguments in an attempt to salvage their contract claim. *See* Pls.' Cross–Mot. at 46–49. First, they argue that the breach of contract has taken place within the last six years. This argument fails because claims begin to accrue when all of the actions necessary to formulate the claim have taken place and the claimant knows or should have known of the claims' existence. *See Kinsey v. United States*, 852 F.2d 556, 557 n. * (Fed.Cir.1988). The United States' refusal to assign lands or send trust proceeds to lineal descendants who did not belong to the communities should have made plaintiffs aware of the alleged breach of contract. Second, and relatedly, they invoke the continuing-claim doctrine. The continuing-claim doctrine "operates to save parties who have pled a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event." *Ariadne Fin. Servs. v. United States*, 133 F.3d 874, 879 (Fed.Cir.1998). The documentary materials before the court include a letter from the Field Solicitor stating that the 1886 monies would be trans-

---

18. The government argues that the lineal descendants are ineligible to receive proceeds from the casinos under the 1988 Indian Gaming Regulatory Act, 25 U.S.C. § 2710. Def.'s Supp. Br. at 9

n.4. At this point, the court need not rule on this issue because the breach of fiduciary duty involves more than the failure to gather and distribute proceeds from the casinos.

ferred to the communities in light of the 1980 Act: "It is my understanding that the apportioned share belonging to or identified for the Shakoppee [*sic*] Community has already been turned over to that group. Similar action should be taken as to the other two communities claiming an interest in these monies." Lower Sioux *Amicus* Br.App. 4, at 2 (Letter from Elmer T. Nitzschke to Edwin Demery (Feb. 6, 1981) (quoted more fully *supra*, at 533)). This distribution to the communities appears to have taken place in 1981. Since then, the alleged default consists of a failure to gather and segregate 1886 monies and to hold them for the lineal descendants.

Third, the plaintiffs claim they did not have adequate notice because the United States insisted that the lineal descendants did not have title. These very statements, however, should have given them notice that the United States was repudiating its alleged contractual duties. Fourth, they request that the court apply equitable tolling to save their contractual claim. Equitable tolling is applied "sparingly" and usually when "the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). No evidence of such misconduct has been provided. Fifth, plaintiffs claim that Count III, which repeats the claims of breach of contract on behalf of minors, was tolled until three years after the minors reached majority age. This argument fails because, as described above, any alleged breach of contract took place in 1981 at the latest. Eighteen years is the age of majority in Minnesota. *See* Minn.Stat. § 645.451. The applicable statute of limitations, 28 U.S.C. § 2501, treats children as if they were legally unable to file suit and allows filing within three years after a child reaches majority status. The latest date anyone who had a claim at the time of breach could have turned eighteen is 1999, assuming the breach took place in 1981, and the additional three years gave such a young adult until 2002 to file. This claim was filed in

2003, so the minors' contract claims are time-barred as well.

For the foregoing reasons, plaintiffs' claims of breach of contract are dismissed.

### D. The Menominee Tribe Exception

As a final jurisdictional issue, the court raises *sua sponte* the question of whether plaintiffs' suit is barred by *Menominee Tribe v. United States*, 221 Ct.Cl. 506, 607 F.2d 1335 (1979). In *Menominee Tribe*, the Court of Claims was concerned with a statute terminating a trust for the benefit of the Menominee Tribe. In that context, the court held that it lacked jurisdiction over claims of breach of fiduciary duty when the alleged breach consisted of an act of Congress within Congress's constitutional powers. *Id.* at 1344 ("[W]hen the valid acts of Congress itself are assailed as unjust, unfair, in bad faith, or blind to the Indians' interest—in a case not raising a constitutional claim—we do not believe that Congress intended in sections 1491 or 1505 to repose that unusual authority ... in this court."). In *Menominee Tribe*, the Court of Claims conceded that a federal agency or official could render the United States liable for breach of fiduciary duty, but it rejected the proposition that an act of Congress could do so, or at least that Congress would not have intended to waive the government's sovereign immunity against suit in such circumstances. *Id.* at 1340. The present case is distinguishable from *Menominee Tribe* because here it was the *Department of Interior* that allegedly breached its duty to the lineal descendants, not Congress. As discussed previously, the 1980 Act did not by its terms terminate the trust for the benefit of the lineal descendants of the loyal Mdewakanton. Although the 1980 Act is hardly a model of good legislative drafting, it only conveyed to the communities that title which the United States previously possessed, and the United States had only a bare legal title as trustee because the equitable title belonged to the lineal descendants. Moreover, because the 1980 Act concerned only title to land, it did not address the 1886 monies in any respect. Consequently, the Department of Interior's distribution of trust funds consisting of monies derived from the 1886 lands allegedly violated its obligations

under the trust created by the 1888, 1889, and 1890 Acts of Congress.

*Menominee Tribe* also abjured any jurisdiction over executive actions implementing congressional acts that would be deemed a breach of fiduciary duty. *Menominee Tribe,* 607 F.2d at 1345 ("Unless the Department violated the Constitution or some outstanding directive of Congress, the United States cannot be held liable for Interior's affirmative actions or passive omissions with respect to the passage and implementation of the Termination Act."). In the present case, the Department violated the directives of Congress to serve as a trustee for the lineal descendants. The Department of Interior may have been relying on a misinterpretation of the 1980 Act when it transferred 1886 monies to the communities and thereafter failed to gather, hold, and distribute proceeds from the beneficial use of the 1886 lands, but this reliance does not change its breach of the duties imposed on it by earlier acts of Congress.

In short, the *Menominee Tribe* exception does not operate to divest this court of jurisdiction it otherwise would have under the Tucker Act and the Indian Tucker Act to consider plaintiffs' claims of breach of trust. Even if *Menominee Tribe* remains good law, the alleged breach in this case does not stem from a constitutional act of Congress that terminated a trust.

Moreover, the court is well aware that *Menominee Tribe* may well have been overruled by the Supreme Court's decisions in *Mitchell II* in 1983 and *White Mountain Apache* in 2003. In *Menominee Tribe,* the Court of Claims was reluctant to find that the United States had waived its sovereign immunity over a claim of breach of a fiduciary duty that stemmed from a statute terminating a trust for the benefit of Indians. *See, e.g.,* 607 F.2d at 1342 ("[I]t has also been

established for at least seventy years that Congress has the unilateral and plenary power ... to abrogate or modify, by statute, a prior treaty with Indians."). Even though the Court of Claims in *Menominee Tribe* conceded that the texts of both the Tucker Act and Indian Tucker Act would have permitted suit, the "historical treatment of consents to Indians to sue the sovereign in this court" justified a limiting interpretation of these Acts. *Id.* Notably, *Mitchell II* was decided by the Supreme Court only three years after *Menominee Tribe,* and *Mitchell II* discerned no impediment in either the Tucker Act or the Indian Tucker Act to this court's jurisdiction to consider claims of breach of fiduciary duty, however such claims might arise.

In *Mitchell II,* the Supreme Court concluded that the Tucker Act and the Indian Tucker Act constituted the government's waiver of sovereign immunity and that no further, or second, waiver of sovereign immunity was needed for this court to have jurisdiction over a claim of breach of fiduciary duty. Further, what was needed was a source of substantive law that could be "fairly ... interpreted as mandating compensation by the Federal Government for the damages sustained," creating a money-mandating duty. 463 U.S. at 218, 103 S.Ct. 2961. *White Mountain Apache* reaffirmed this interpretation of the Tucker Act and the Indian Tucker Act, and arguably eased somewhat the showing required to establish a money-mandating duty. *See supra,* at 544. In short, *Mitchell II* and *White Mountain Apache* negated the premise of *Menominee Tribe* by concluding that there was no basis for a constrained interpretation of the statutory waiver of sovereign immunity in the Tucker Act and Indian Tucker Act, at least in Indian trust cases.[19] Finally, even if *Mitchell II* and *White Mountain Apache* left any doubt that the *Menominee Tribe* excep-

---

**19.** After *Mitchell II, Navajo Nation,* and *White Mountain Apache,* a commentator concluded that the focus was no longer on sovereign immunity in Indian trust cases but rather on a substantive money-mandating source of law:

> [W]hile a party still must find a substantive money-mandating source of law for a claim beyond the Tucker Act, the party need not find a separate waiver of sovereign immunity else-

where; nor is the interpretation of that proposed source of substantive law subject to the strict construction rule that otherwise controls the threshold determination of whether the government has waived immunity.

Gregory C. Sisk, *Yesterday and Today: Of Indians, Breach of Trust, Money, and Sovereign Immunity,* 39 Tulsa L.Rev. 313, 335 (2003).

tion no longer was viable, the Indian Trust Accounting Statutes should dispel any such residuum. The Indian Trust Accounting Statutes reveal a congressional willingness to resuscitate, preserve, and enable suits against the government as trustee. The Court of Claims' 1979 decision in *Menominee Tribe* does not constitute a jurisdictional bar to this suit.

### Partial Summary Judgment

Plaintiffs' cross-motion for partial summary judgment focuses on three issues: whether the lineal descendants are the trust beneficiaries of the 1886 lands, whether the United States has breached its fiduciary duties, and whether the government has breached its contractual duties. Pls.' Cross-Mot. at 1. This motion is granted in part and denied in part. As the preceding analysis shows, the plaintiffs are entitled to a partial summary judgment that a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus. This trust was not extinguished by the 1980 Act, and the statute of limitations does not bar plaintiffs' claim of breach of fiduciary duty because of the Indian Trust Accounting Statute.[20] The undisputed record also shows that the government breached its fiduciary duties respecting the trust, and partial summary judgment is appropriate in this respect as well.

Plaintiffs' motion is otherwise denied. The record is incomplete as to the extent of the breach by the government of its fiduciary duties. No accounting has been rendered. No inventory of funds and lands constituting the corpus has been made, and plaintiffs who belong to a community may have received benefits. Because plaintiffs include mem-

bers of each of the three communities as well as non-members, individual plaintiffs may differ insofar as they have suffered injury from the breach. Hr'g Tr. at 47–49. Entry of partial summary judgment in favor of plaintiffs thus does not extend beyond a conclusion that the government has as a general matter breached its fiduciary duties under the trust created for the loyal Mdewakanton and their lineal descendants. Lastly, because the contract claims are being dismissed on statute of limitations grounds, summary judgment cannot be entered on those claims.

Accordingly, plaintiffs' cross-motion for partial summary judgment is granted in part and denied in part.

### Amendment of the Complaint

Plaintiffs have moved for leave to file a Second Amended Complaint to add both additional named and anonymous plaintiffs. Plaintiffs have also moved for an order protecting the identities of the anonymous plaintiffs. By the proposed amendment, the total number of plaintiffs would be raised to more than 500. Pls.' Mot. for Leave to Amend Compl., Attach. A at I. The original complaint named 134 individual plaintiffs, and the First Amended Complaint increased the total number of named plaintiffs to 251. Plaintiffs' request for anonymity pertains to alleged lineal descendants who are currently members of a community and are concerned that their participation would be viewed as adverse to the communities and would risk termination of their membership or who are applying for membership to communities and are concerned they would be denied admission if the communities learn of their participation in this case. Hr'g Tr. at 88–89.

Plaintiffs' motion to amend their complaint raises procedural issues of joinder and public access to judicial proceedings.[21] All of the

---

**20.** At this early stage of the case, plaintiffs rest on allegations that they are lineal descendants of the loyal Mdewakanton. Future proceedings will be held to determine whether plaintiffs satisfy their burden of proof on this factual issue. The government argues that the plaintiffs have produced insufficient evidence to prove their standing at the summary judgment stage. *See* Def.'s Reply at 20 (citing *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 (holding that for a summary judgment, unlike for resisting a motion to dismiss,

plaintiffs must set forth "specific facts" establishing the court's jurisdiction)). Here, the plaintiffs have produced undisputed evidence that supports standing to obtain a partial summary judgment with respect to their claims of breach of fiduciary duty.

**21.** It also engenders concerns about potential class-certification proceedings and notice to potential additional parties. These additional ques-

prospective additional plaintiffs must satisfy the requirements of permissive joinder before they can join in this action. In addition, respecting the request of some plaintiffs for anonymity, the court must balance their need for anonymity against potential prejudice to the government and the public's interest in knowing their identity. For its part, the government represents that it does not oppose plaintiffs' request to add additional named plaintiffs, but it does object to plaintiffs' requests to add anonymous plaintiffs and for a protective order. Def.'s Resp. to Pls.' Mot. for Leave to Amend Compl. at 1.

### A. Additional Plaintiffs

 Adding additional individual plaintiffs who allegedly are lineal descendants of the loyal Mdewakanton raises the same issue of joinder as that which arises with the individuals who are currently named as plaintiffs. The pertinent rule, RCFC 20(a), provides that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Individual plaintiffs must satisfy the requirements of this Rule.

First, all of the plaintiffs would be jointly asserting claims for breach of the same fiduciary duty. As specified in their complaint, the plaintiffs claim to sue as individuals "on behalf of themselves and all other descendants of persons listed on the May 20, 1886 U.S. Mdewakanton census." Am. Compl. ¶ 2. The court construes this language to mean that the named plaintiffs are asserting their claims jointly and severally, and as representatives of a potential class comprised of four subclasses. See supra, at 534. Thus, all of the prospective plaintiffs would be asserting a right to relief jointly and severally, and, in addition, their claims arise out of the same transaction or occurrence, viz., the trust created by the appropriations statutes enacted in 1888, 1889, and 1890. In that regard, the plaintiffs' relationship satisfies the first element of Rule 20(a).

The plaintiffs' circumstances in this case are readily distinguishable from the misjoined plaintiffs addressed by the recent decision in Franconia Associates v. United States, 61 Fed.Cl. 335 (2004). In that case, a number of property owners sued the United States for breach of loan agreements, but each plaintiff had entered into a separate agreement. The plaintiffs in Franconia did not meet the first requirement of RCFC 20(a) because, although their claims shared common legal and factual issues, the claims did not arise out of the same transaction or occurrence. Id. at 337.

Second, in this case there are questions of law or fact that would be common to all of the plaintiffs. This requirement "is usually easily satisfied, particularly since there must be only one such overlapping question." Id. at 336. Here, all or most of the legal issues would be common to the plaintiffs, as would many of the factual issues.

In sum, permissive joinder of additional lineal descendants of the loyal Mdewakanton is proper under RCFC 20(a), and, accordingly, plaintiffs are granted leave to file a Second Amended Complaint to add such plaintiffs.

### B. Anonymous Plaintiffs

 RCFC 10(a) provides that the title in a complaint "shall include the names of all the parties." The use of pseudonyms in a complaint is contrary to this requirement. Consequently, courts allow parties to proceed anonymously only where unusual circumstances justify concealing a party's identity. See Does I Thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1067 (9th Cir.2000) (collecting cases). Five federal courts of appeals that have reviewed a trial court's denial of a party's request to proceed anonymously have instructed trial courts to balance the competing interests involved. See id. at 1068; M.M. v. Zavaras, 139 F.3d 798, 803–04 (10th Cir.1998); James v. Jacobson, 6 F.3d 233, 238 (4th Cir.1993); Doe v. Frank, 951 F.2d 320, 323–24 (11th Cir.1992); Doe v. Stegall, 653 F.2d 180, 186 (5th Cir.1981). Specifically, these circuits have held that a trial court should weigh the party's need for

---

tions are addressed in the closing portions of this opinion.

anonymity against the general presumption that parties' identities be available to the public and the likelihood of prejudice to the opposing party. *Advanced Textile,* 214 F.3d at 1068 (citations omitted).

▮▮▮ The Ninth Circuit has drawn from these precedents five factors to guide a trial court's inquiry into the need for anonymity where the party seeking anonymity is relying on a fear of retaliation: "(1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to such retaliation." *Id.* (internal citations omitted). In addition, the court must determine (4) whether disclosure of the party's identity would best serve the public interest. *Id.* at 1068–69 (citing *Stegall,* 653 F.2d at 185, and observing that " '[p]arty anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them.' "). Finally, and importantly, "[t]he court must also determine [5] the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice." *Id.* at 1068 (citing *James,* 6 F.3d at 240–41).

▮▮▮ The plaintiffs aver that certain alleged lineal descendants, including both those who are currently members of a community and those who are applying for membership in a community, would face retaliation by their respective community. Hr'g Tr. at 88–89. The government asserts that plaintiffs have not made a compelling showing in support of their request for anonymity. Def.'s Resp. to Pls.' Mot. for Leave to Amend Compl. at 2–3.

Respecting the severity of a threatened harm in general, some courts have opined that "some embarrassment or economic harm is not enough," but rather, "[t]here must be a strong social interest in concealing the identity of the plaintiff." *Doe v. Rostker,* 89 F.R.D. 158, 162 (N.D.Cal.1981) (citing *Lindsey v. Dayton–Hudson Corp.,* 592 F.2d 1118, 1125 (10th Cir.1979)). "The common thread running through these cases [addressing requests by plaintiffs for anonymity] is the presence of some social stigma or the threat of physical harm to the plaintiffs attaching to

disclosure of their identities to the public record." *Rostker,* 89 F.R.D. at 161.

In all events, for purposes of supporting their request for leave to add anonymous plaintiffs, the plaintiffs in the instant case have established that the threatened harm justifies their request. The anonymous plaintiffs not only risk economic harm through the loss of per-capita payments but also risk loss of membership in the communities in which they are, or are seeking to become, members. Plaintiffs' fears are reasonable because the communities oppose this lawsuit both jurisdictionally and on the merits, and the community governments possess nearly a plenary power over community membership. *See* Pls.' Opp'n to *Amicus* App. Ex. 9, at 2 (Prairie Island Const. art. III, §§ 4–5); *id.,* Ex. 10, at 2 (Lower Sioux Const. art. III, §§ 4–5); *id.,* Ex. 13, at 1 (Shakopee Const. art. II, §§ 1(c), 2). Finally, lineal descendants who are either members or seeking to become members of Shakopee and Prairie Island Communities are particularly vulnerable to retaliation because they are minorities in those communities. Hr'g Tr. at 89–90.

Against plaintiffs' need for anonymity must be balanced the risk, if any, of unfairness to the government. The government asserts that pseudonyms would make difficult the task of verifying the identity, tribal membership, and ancestry of each anonymous plaintiff. The government contends that it may have to consult numerous government agents and possibly the communities themselves to obtain evidence of ancestry. Def.'s Resp. to Pls.' Mot. for Leave to Amend Compl. at 1–2. This contention is without merit. Respecting the participation of government agents in the verification of plaintiffs' lineage, all such government agents would be subject to an appropriate protective order. Those government agents would be provided with a list containing each pseudonym and corresponding true name and would be required to maintain the confidential nature of the information contained in that list. Moreover, the government could simply obtain membership lists from the communities and cross-check those lists with the list provided by plaintiffs. The government has not

shown that it will be prejudiced by the addition of anonymous plaintiffs at this preliminary stage in proceedings. In this regard, it is instructive that "the balance [among the factors] ... may change as the litigation progresses." *Advanced Textile*, 214 F.3d at 1069.

> In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings, *see* Fed.R.Civ.P. 16(b), and to issue protective orders limiting disclosure of the party's name, *see* Fed.R.Civ.P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. It may never be necessary, however, to disclose the anonymous parties' identities to nonparties to the suit.

*Id.*

There also is no indication at this time that the public's interest in the case would best be served by requiring that all of plaintiffs' identities be disclosed. More than 250 plaintiffs are named. In the circumstances at hand, the public's interest is not unduly impaired when some additional similarly-situated plaintiffs proceed anonymously. *See Stegall*, 653 F.2d at 185. This result also accords with the practice of the Bureau of Indian Affairs in providing anonymity to loyal Mdewakanton who are involved in membership disputes with one of the communities. *See supra*, at 530 (citing Pls.' Ex. 33 (Letter from Bureau of Indian Affairs, Midwest Regional Office to Anonymous Mdewakanton (Aug. 20, 2001))).

For these reasons, the plaintiffs are granted leave to file a Second Amended Complaint that includes some anonymous plaintiffs. An appropriate protective order will be issued at a later date.

### Future Proceedings Respecting Class Certification

Despite the class allegations in this case, at the hearing on the pending motions, plaintiffs' counsel represented that he was unsure of his intentions at that time with respect to moving for certification of the class. *See* Hr'g Tr. at 86–87.

RCFC 23, unlike its counterpart in the federal rules, "contemplates only opt-in class certifications, not opt-out classes." RCFC 23 Rules Committee Note, 2002 Revision; *see also Taylor v. United States*, 41 Fed.Cl. 440, 448 (1998) ("While the district courts regularly certify class actions on an opt-out basis, the Court of Federal Claims has traditionally applied an opt-in approach to class actions."). This court applies the criteria for certifying a class set out in *Quinault Allottee Association v. United States*, 197 Ct.Cl. 134, 453 F.2d 1272 (1972). *See* RCFC 23 Rules Committee Note, 2002 Revision. The *Quinault Allottee* criteria are that:

> (1) members must constitute a large but manageable class; (2) there is a question of law common to the whole class; (3) a common legal issue overrides separate factual issues affecting individual members; (4) claims of the party plaintiffs are typical of claims of the class; (5) the Government must have acted on grounds generally applicable to the whole class; (6) the claims of many claimants must be so small that it is doubtful they would be otherwise pursued; (7) the party plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; and (8) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications.

*Taylor*, 41 Fed.Cl. at 445 (citations omitted).

Although in this case, the large number of plaintiffs already named may constitute the functional equivalent of an opt-in class, a potential problem arises as to notice to those lineal descendants who are not named as plaintiffs. *Cf. id.* at 448 (Because "the opt-in procedure amounts to little more tha[n] a permissive joinder rule[,] ... [i]t is ... of limited use in informing potential class members of the suit and the claimants' right to join the suit."). The record does not indicate the extent to which such notice has been accomplished. Thus, the court must reserve for further proceedings the issues respecting class certification and notice. If class certification is sought, the notice provisions of RCFC 23(c)(2)(B) will apply, and notice will be effected in accord with those provisions. If plaintiffs do not move to certify a class or

subclasses,[22] they shall propose to the court a procedure for providing notice to all lineal descendants who are not named as parties in this action in accord with RCFC 14(b).[23] *See also Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (a federal trial court has a responsibility to oversee joinder of additional parties in an orderly manner); RCFC 83(b) (courts may "regulate practice in any manner consistent with federal law or rules"). On or before January 10, 2005, plaintiffs shall either move for class certification or they shall propose means of providing notice in compliance with RCFC 14(b).

*Potential Summons under RCFC 14(a)*

In light of the court's resolution of the dispositive motions, the government shall inform the court whether it seeks to request that summons be issued pursuant to RCFC 14(a).[24] Such notice or motion shall be filed with the court on or before February 10, 2005.

### CONCLUSION

For the reasons stated, the court denies the government's motion to dismiss this action respecting counts I (trust mismanagement) and IV (claim for attorney's fees). The court, however, grants the government's motion to dismiss count II (breach of contract) and the contract claims in count III (separately-pled claims of minor class plaintiffs). The trust mismanagement claims of count III are deemed to be subsumed within count I.

The court grants plaintiffs' cross-motion for partial summary judgment that (1) a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriation Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus, (2) such trust was neither extinguished nor terminated by the 1980 Act, and (3) such trust was breached by the United States through actions taken in December 1980 and thereafter. The court otherwise denies the plaintiffs' motion for partial summary judgment.

Plaintiffs' motion for leave to file a Second Amended Complaint is granted, as is plaintiffs' motion for leave to include anonymous plaintiffs. Plaintiffs' Second Amended Complaint shall be filed on or before January 10, 2005. A separate protective order will be issued respecting anonymous plaintiffs.

The motions to participate as *amici curiae* filed by the Lower Sioux Indian Community in Minnesota, the Shakopee Mdewakanton Sioux (Dakota) community, the Prairie Island Indian Community in Minnesota, and Raymond Cermak, Sr. are granted. The participation by *amici curiae* shall be limited to filing briefs.

On or before January 10, 2005, plaintiffs shall either file a motion for certification of a class and subclasses, or they shall file a proposed means of providing notice to interested parties pursuant to RCFC 14(b). On or before February 10, 2005, the government shall file a notice informing the court wheth-

---

**22.** RCFC 23(c)(4)(B) provides that "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

**23.** RCFC 14(b) provides in part as follows:

(b) *Notice to Interested Parties.*

(1) The court, on its own motion or on the motion of a party, may notify any person with legal capacity to sue and be sued and who is alleged to have an interest in the subject matter of any pending action. Such notice shall advise of the pendency of the action and of the opportunity to seek intervention and to assert an interest in the action.

**24.** RCFC 14(a)(1) provides that "[o]n motion of the United States, the court may summon any third person against whom the United States may be asserting a claim or contingent claim for the recovery of money paid by the United States in respect of the transaction or matter which constitutes the subject matter of the suit to appear as a party and defend the third party's interest, if any, in such a suit."

The notice should also address this court's jurisdiction. *Compare United States v. Wurts*, 303 U.S. 414, 415–16, 58 S.Ct. 637, 82 L.Ed. 932 (1938); *DiSilvestro v. United States*, 405 F.2d 150, 155 (2d Cir.1968); *and* 28 U.S.C. §§ 1503, 2508, *with Barrett Ref. Corp. v. United States*, 242 F.3d 1055, 1062 (Fed.Cir.2001). *See generally Bank One, Michigan v. United States*, 62 Fed. Cl. 474, 477, No. 01–325C (July 31, 2003).